COURT OF APPEALS OF VIRGINIA


Present:    Judges Humphreys, Beales and Senior Judge Fitzpatrick


BARBIE BAILEY
                                                    MEMORANDUM OPINION*
v.        Record No. 3091-06-4                          PER CURIAM
                                                       JUNE 19, 2007
CITY OF ALEXANDRIA
  DEPARTMENT OF HUMAN SERVICES


              FROM THE CIRCUIT COURT OF THE CITY OF ALEXANDRIA
                            Lisa B. Kemler, Judge

              (Dale Warren Dover, on brief), for appellant.

              (Jonathan Westreich, on brief), for appellee.

              (Gwena Kay Tibbits, on brief), Guardian *ad litem* for the minor
              child.


        Barbie Bailey (mother) appeals the trial court's decision terminating her residual parental

rights to her minor child, L.B, born on January 24, 1996.  Mother contends (1) the trial court erred

in permitting the City of Alexandria Department of Human Services (DHS) to establish via its case

worker's expert opinion that termination of mother's parental rights and adoption of L.B. was in

L.B.'s best interests; (2) the omission from DHS's trial exhibits of the most recent foster care plan,

which documented termination of residual parental rights as being in L.B.'s best interests, deprived

mother of due process; and (3) the evidence was insufficient to support termination of her residual

parental rights to L.B. under Code § 16.1-283(B)(1) and (C)(2).  We have reviewed the record and

briefs of the parties, and conclude that this appeal is without merit.  Accordingly, we summarily

affirm the trial court's decision.  See Rule 5A:27.

---

        * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

I.  Case Worker's Testimony

Mother argues that allowing DHS case worker Stephanie Morrow to render an expert

opinion pursuant to Code § 8.01-401.3 - - that termination of mother's residual parental rights to

L.B. and adoption was in L.B.'s best interests - - impermissibly invaded the province of the fact

finder because it allowed Morrow to testify to a conclusion of law or ultimate fact in controversy

and violated the Due Process Clause.[1]  Mother alleges that "in the context of an adversarial

termination proceeding, permitting the agency as a party to opine the best interests determination

would seem fundamentally unfair."

Mother did not raise a due process argument before the trial court when objecting to

Morrow's testimony at the time it was offered.  "The Court of Appeals will not consider an

argument on appeal which was not presented to the trial court."  Ohree v. Commonwealth, 26

Va. App. 299, 308, 494 S.E.2d 484, 488 (1998).  See Rule 5A:18.  Accordingly, Rule 5A:18 bars

us from considering mother's due process argument for the first time on appeal.

> Although Rule 5A:18 allows exceptions for good cause or
> to meet the ends of justice, appellant does not argue that we should
> invoke these exceptions.  See e.g., Redman v. Commonwealth, 25
> Va. App. 215, 221, 487 S.E.2d 269, 272 (1997) ("In order to avail
> oneself of the exception, a *defendant must affirmatively show* that a
> miscarriage of justice has occurred, not that a miscarriage might
> have occurred." (emphasis added)). We will not consider, *sua
> sponte*, a "miscarriage of justice" argument under Rule 5A:18.

Edwards v. Commonwealth, 41 Va. App. 752, 761, 589 S.E.2d 444, 448 (2003) (*en banc*).[2]

---

[1] While mother never specifically mentions in her opening brief the name of the case
worker she is referring to in her argument with respect to Question Presented I, the pages of the
trial transcript that she cited to as to where she preserved this question for appellate review
pertain to Morrow's testimony.  As such, that is the only testimony we have considered on
appeal with respect to this question.

[2] To the extent that mother's opening brief can be interpreted as raising an argument
regarding racial discrimination in termination cases, we did not consider that argument as it was
not raised before the trial court.  See Rule 5A:18.  In addition, we did not consider mother's
recitation of Dalia Schlegel's testimony and qualifications within the argument section of her

Code § 8.01-401.3 provides that "[n]o expert or lay witness while testifying in a civil proceeding shall be prohibited from expressing an otherwise admissible opinion or conclusion as to any matter of fact solely because that fact is the ultimate issue or critical to the resolution of the case." To the extent that mother's opening brief can be construed as making an argument that Code § 8.01-401.3 did not apply to allow Morrow's testimony because termination proceedings in Virginia "might be more aptly characterized as hybrid hearings, civil in name, criminal in nature," we find no merit in that argument. Based upon the plain language of Code § 8.01-401.3, the trial court, in a civil case such as this matter, did not err in admitting Morrow's testimony that adoption was in the best interests of L.B. See generally Santosky v. Kramer, 455 U.S. 745 (1982) (applying civil burden of proof not criminal beyond a reasonable doubt standard in termination of parental rights case).[3]

## II. Foster Care Plan

Mother concedes that in a termination of parental rights proceeding before a circuit court there is no requirement that the most recent foster care plan be re-filed or submitted into evidence. See Todaro v. Alexandria Dep't of Soc. Servs., 226 Va. 307, 308-09, 309 S.E.2d 303, 304 (1983). Nonetheless, she argues that DHS's failure to include the most recent foster care plan in its trial exhibits caused the trial court to make a decision based on stale documentary evidence and without

---

opening brief related to Question Presented I, as any alleged error in allowing Schlegel to testify was not included in Question Presented I based on the trial transcript pages referenced by mother as to the place in the record where she preserved that question for appellate review.

[3] We note that in her argument with respect to Question Presented I, mother posed the following question: "Does the best interest determination as codified in Section 16.1-283B amount to a 'conclusion of law,' as it is reserved for the Court's determination?," but then she failed to include any argument or cite to any authority to answer that question or support that assertion. "Statements unsupported by argument, authority, or citations to the record do not merit appellate consideration. We will not search the record for errors in order to interpret appellant's contention and correct deficiencies in a brief." Buchanan v. Buchanan, 14 Va. App. 53, 56, 415 S.E.2d 237, 239 (1992).

the benefit of considering the current status of mother's family. Mother further alleges that "the omission of the most recent foster care plan deprived her of specific notice of her alleged failures as a parent which precipitated termination." Finally, she contends that omission of the most recent foster care plan enabled DHS, between the initial trial in the juvenile and domestic relations district court ("J & DR court") and the trial *de novo* in the circuit court, to modify the provisions under which it sought termination. We disagree.

Contrary to mother's assertions, the relevant pleadings, including the most recent foster care plan, were before the circuit court as part of the documents filed by mother when she appealed the J & DR court's decision terminating her residual parental rights to L.B. Code § 16.1-283 provides that before a petition seeking termination of parental rights may be accepted by the court, a foster care plan must be filed pursuant to Code § 16.1-281 that documents termination as in the best interests of the child. Code § 16.1-281 provides that "the department . . . shall file the plan with the juvenile and domestic relations district court . . . ." Thus, the record shows that DHS complied with the statute and that the foster care plan was before the circuit court. No statutory requirement made it necessary for DHS to re-file the foster care plan in the circuit court. See Todaro, 226 Va. at 308-09, 309 S.E.2d at 304.

We also find no merit in mother's argument that she did not have notice of her failures as a parent because the foster care service plan was not filed in the circuit court or offered as a trial exhibit by DHS. Mother had notice of the substance of the foster care service plan through the J & DR court proceeding, which she appealed to the circuit court. In addition, DHS provided a voluminous list of trial exhibits and witnesses to mother well in advance of trial.

III. Sufficiency to Support Termination

We view the evidence in the light most favorable to the prevailing party below and grant to it all reasonable inferences fairly deducible therefrom. See Logan v. Fairfax County Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 462 (1991).

So viewed, the evidence showed that in 2001, due to lack of supervision of her children, a filthy home, and the children's poor hygiene, DHS began providing voluntary services to mother. These services included home-based counseling, individual therapy, mental health therapy, and an in-home aide to teach mother how to clean and organize her home and her four children. While mother initially cooperated, problems persisted and, due to mother's sporadic compliance, DHS filed an Abuse and Neglect Petition in October 2002, which was subsequently converted into a CHINS petition, because DHS believed mother had the potential to make the changes necessary for her to care for her children.

On October 29, 2002, the J & DR court entered a Preliminary Child Protective Order, which it made final on January 9, 2003, directing mother to complete a mental health evaluation, follow all treatment recommendations, cooperate with all home-based services, ensure proper hygiene of her children at all times, and cooperate with school officials to ensure her children's academic success.

In August 2003, DHS filed another Abuse and Neglect Petition and the J & DR court entered a new protective order similar to the first one, mirroring the same services offered mother since 2001. DHS filed the new petition because mother was not cooperating with services. She had stopped seeing the home-based counselor, her home was filthy again – with food ground into the carpet, the door ripped off the hinges, holes in walls, and the children smelling of urine and feces. On October 3, 2003, an agreed upon finding was made that L.B.

was abused and neglected as defined in Code § 16.1-228, and the J & DR court entered another protective order.

On September 9, 2004, L.B. and mother's other children were removed from her care under an Emergency Removal Order. At that time, Michelle Mintling, the social worker assigned to the case, made an unannounced visit to mother's home after being alerted that L.B. had not attended school that term. Mother's probation officer and the CASA volunteer were already at the home when Mintling arrived. Mother's home was cluttered to the point of posing a safety hazard to the children - - no sheets on the beds; dirty mattresses; broken beds piled high with clothing; rooms smelling of urine; bowls of dried food in the children's rooms; dirty dishes in the sink; filthy walls and carpets, which had been painted five months earlier; and the front door, which had been broken in twice, no longer locked. Mintling found L.B., who was eight years old, home alone with an unknown adult male, rather than in school. L.B. was crying because she did not have any shoes and, therefore, could not go to school. That morning mother had tested positive for marijuana and opiates. When mother arrived home an hour later, she admitted that she had smoked marijuana, but claimed the opiates were from prescription drugs, yet was unable to produce the prescription or pill bottle. While Mintling was at the house, at least six young men came and went from the home as if they lived there. The extent of the damage to mother's home, which was worse than Mintling had seen in 2001, caused mother to be evicted.

Starting in September 2004, DHS continued to offer an array of services to mother, including up to 140 hours per month of home-based counselor services to assist mother in learning the daily responsibilities of being a parent, to teach her about the effect of her behavior on her children, and to assist her with obtaining employment. In October 2004, social worker Stephanie Morrow took over the case for DHS.

By dispositional order entered on December 15, 2004, the J & DR court transferred custody of L.B. to DHS under a foster care plan filed on November 15, 2004, with the goal of return to parent and concurrent goal of relative placement. Pursuant to that plan, which the court approved and incorporated by reference, mother was given target duties to complete a substance abuse evaluation, obtain a referral to drug court programs, seek a mental health evaluation, follow treatment recommendations of mental health and the drug court, find and maintain employment, find and maintain appropriate housing which could accommodate her children, demonstrate her ability to keep her housing clean, and free of any health and/or safety hazards, attend and participate in a family group conference to determine her relatives' interest and availability to assist her and her children, complete a parent fitness assessment, follow any recommendations related to her role as a parent, maintain regular visits with her children, attend school meetings and events related to the children, and maintain contact with her DHS social worker. DHS agreed to continue to provide services to mother to assist her in meeting those goals.

Dalia Schlegel, the home-based counselor who began working with mother in November 2004, testified that mother was supposed to submit five applications per week for a job, but initially failed to do so. Mother waited ten and one-half months to have her evaluation for drug court and appeared intoxicated on some of Schlegel's visits. Mother failed to find appropriate housing and continued to demonstrate that she could not maintain a home in proper condition.

In May 2005, DHS filed a Foster Care Service Plan Review with the goal of return to parent, with a target date of December 31, 2005. At that time, mother was receiving outpatient substance abuse treatment, had recently started drug court, and was meeting with a mental health counselor and a home-based counselor. However, issues remained. Mother had not yet obtained appropriate housing or regular employment; she tended to minimize her substance abuse issues;

- 7 -

she reported to her substance abuse evaluation, her probation officer, and for visitation with her children under the influence of alcohol; and she could not consistently control her anger and avoid emotional outbursts.

In October 2005, the J & DR Court entered a permanency planning order amending the target date for returning L.B. to mother from December 31, 2005 to April 27, 2006, and continuing custody of L.B. with DHS. As of that time, L.B. had been in foster care for approximately one year and mother had been receiving services for almost four years. The court approved a plan with the goal of return to parent, concurrent with relative placement. That plan identified the main barrier to reunification as being that mother had to establish suitable housing and demonstrate that she could maintain an orderly and safe home environment.

On March 29, 2006, DHS filed another Foster Care Service Plan with the goal of return to parent and concurrent goal of relative placement. That plan acknowledged mother's progress with her substance abuse and parenting issues and that she had obtained housing and part-time employment, but noted that the situation was still not sufficiently improved to allow L.B. to return home permanently. At that time, L.B. had some trial visits with mother on weekends. L.B. was scheduled to move home in April 2006. If that return of physical custody did not result in any significant safety issues over the next few months, the plan called for a recommendation of return of legal custody of L.B. to mother.

From April 13, 2006 to April 16, 2006, L.B., along with her siblings, returned home for a trial visit, for the first time since L.B.'s removal from mother's care eighteen months earlier. Prior to the return, mother executed a safety plan in which she agreed to continue all services, ensure the children had adequate adult supervision, and keep them away from bad influences. Mother assured Morrow that she had taken time off from work and would be home while the children visited. Later, mother admitted to Morrow that she had lied and did not take time off

from work to be home to supervise the children. Morrow learned that mother was either not present or was asleep during much of the visit and that the children awoke in the morning with no adult supervision. Morrow learned that mother had allowed the three older children to spend the night away from the house and was unaware of when they returned. In addition, mother admitted that she allowed her son to go on the roof and did not perceive that as a safety issue. Mother admitted she was overwhelmed by the children's visit, and Morrow learned that mother wanted to slow down the reunification process and extend the children's time in foster care.

When Schlegel visited the home on April 17, 2006, it was in "shocking condition[ ]," with clumps of hair and garbage strewn about and with nowhere to sit on cluttered couches. Mother would not allow Schlegel to see the bedrooms. Schnegel learned that despite his history of violence and a court order prohibiting contact, the children's father was permitted contact with them. Schlegel acknowledged that over the three years she had worked with mother, mother had made personal progress in the areas of substance abuse and obtaining employment and housing, but that she had not made progress with her ability to parent. Schlegel opined as an expert in family counseling, that based on her training and experience and the time spent with mother and her family, mother could not be an effective parent to her children.

On April 19, 2006, Deputy Steven Hajdasz responded to mother's home regarding a narcotics complaint. When Hajdasz arrived, he found a juvenile male, who did not live in the home, but who was able to enter the unlocked home. Hajdasz also found an adult male at the home. Mother was not at home. The juvenile obtained from inside the house a "homemade bong," which he gave to Hajdasz.

On April 20, 2006, when Sonja Stephens, mother's probation officer,[4] made an unannounced visit to mother's home, Stephens found the carpet stained, boxes stacked in the

---

[4] Mother had been convicted of embezzlement and was on probation.

house, dishes in the sink, open box cutters in more than one room, mattresses without sheets, laundry strewn about the house, and food in the bedrooms. Stephens stated that the house was filthy, worse than other homes she had inspected as a probation officer.

At the next hearing in April 2006, DHS requested that the plan of reunification of the children with mother be disapproved and a goal of adoption for L.B. be approved. According to Morrow, it had become clear that the conditions which led to removal of the children were "replicating themselves very quickly in [mother's] home, and that despite 18 months of very intensive services, we had not managed to change those conditions." Morrow stated that mother's home was still not safe for the children and that although mother was working part-time, her financial resources were stretched thin and she was becoming unable to manage without help from relatives. Morrow stated that reports regarding mother's parenting skills became less positive in the early part of 2006.

Morrow opined that adoption was the proper goal for L.B. due to her young age, ten at the time of trial. Morrow opined based on her training and personal experience with mother that she had not demonstrated that she could effectively and safely parent her children and that adoption was in L.B.'s best interests. Since L.B.'s removal from mother's care in September 2004, L.B. had been in mother's care less than ten days.

Based upon this record, the circuit court terminated mother's residual parental rights to L.B. under Code § 16.1-283(C)(2) and (B)(1), finding that DHS made extraordinary efforts to provide services to mother to enable her to be an effective parent and to maintain a safe and nurturing environment for her children, but despite all the effort and time that had passed, clear and convincing evidence proved that mother had been unable to remedy the conditions which led to L.B.'s removal, and, therefore, termination of mother's parental rights and adoption of L.B.

was warranted. The trial judge found that mother did not have the ability to maintain a safe environment for her children.

The Supreme Court of Virginia has recognized the need to "respect . . . the natural bond between children and their natural parents." Weaver v. Roanoke Dep't of Human Res., 220 Va. 921, 926, 265 S.E.2d 692, 695 (1980). When considering termination of a parent's residual rights to a child, "the paramount consideration of a trial court is the child's best interests." Logan, 13 Va. App. at 128, 409 S.E.2d at 463. "'[T]ermination of [residual] parental rights is a grave, drastic, and irreversible action.'" Helen W. v. Fairfax County Dep't of Human Dev., 12 Va. App. 877, 883, 407 S.E.2d 25, 28-29 (1991) (quoting Lowe v. Dep't of Pub. Welfare of the City of Richmond, 231 Va. 277, 280, 343 S.E.2d 70, 72 (1986)). On review, "[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests." Farley v. Farley, 9 Va. App. 326, 329, 387 S.E.2d 794, 795 (1990). "The trial court's judgment, when based on evidence heard ore tenus, will not be disturbed on appeal unless plainly wrong or without evidence to support it." Logan, 13 Va. App. at 128, 409 S.E.2d at 463.

Code § 16.1-283 provides for the termination of residual parental rights under carefully defined circumstances. Here, the trial court concluded that the evidence warranted termination of mother's residual parental rights to L.B. on alternative grounds, i.e., under subsections (B)(1) and (C)(2) of Code § 16.1-283.

Where a trial court's judgment is made on alternative grounds, we need only consider whether any one of the alternatives is sufficient to sustain the judgment of the trial court and, if we so find, need not address the other grounds. See Boone v. C. Arthur Weaver Co., 235 Va. 157, 161, 365 S.E.2d 764, 766 (1988).

Code § 16.1-283(C)(2) requires proof, by clear and convincing evidence that (1) the termination is in the best interests of the child, (2) "reasonable and appropriate" services have been offered to help the parent "substantially remedy the conditions which led to or required continuation of the child's foster care placement," and (3) despite these services, the parent has failed, "without good cause," to remedy those conditions "within a reasonable amount of time not to exceed twelve months from the date the child was placed in foster care." In addition, "[t]he court shall take into consideration the prior efforts of such [agency] to rehabilitate the parent . . . prior to the placement of the child in foster care." Id.

In determining what is in the child's best interests, a court must evaluate and consider many factors, including the child's age and physical and mental condition, the parent's age and physical and mental condition, the relationship between the child and parent, the child's needs, and the role the parent has and will play in the child's upbringing. Barkey v. Commonwealth, Alexandria Dep't of Human Servs., 2 Va. App. 662, 668, 347 S.E.2d 188, 191 (1986).

"The twelve-month time limit established by Code § 16.1-283(C)(2) was designed to prevent an indeterminate state of foster care 'drift' and to encourage timeliness by the courts and social services in addressing the circumstances that resulted in the foster care placement." L.G. v. Amherst County Dep't of Soc. Servs., 41 Va. App. 51, 56, 581 S.E.2d 886, 889 (2003).

> The legislation established a reasonably presumptive time frame of twelve months for parents to receive rehabilitative services to enable them to correct the conditions that led to foster care placement . . . . If the parent fails to substantially remedy those conditions within twelve months the court may act to prevent the child from lingering in foster care.

Id. at 57, 581 S.E.2d at 889.

The record contains credible evidence to support the trial court's finding that termination is in the best interests of L.B. and that the requirements of Code § 16.1-283(C)(2) have been proven.

Mother's parental rights were terminated because of her lack of progress in remedying the circumstances that led to the child's initial removal from her care. While mother completed some of the DHS recommendations regarding her substance abuse issues, employment, and housing, the evidence clearly proved that additional time would not remedy mother's level of functioning as a parent nor her inability to ensure the health, safety, and well-being of L.B. "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming [her] responsibilities." Kaywood v. Halifax County Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990).

Nothing in the record suggests continued services would alleviate mother's deficits. The testimony before the trial court was to the contrary. Clear and convincing evidence established that mother had not progressed to the point where she was capable of adequately parenting L.B. and providing her a safe home environment. See Jenkins v. Winchester Dep't of Soc. Servs., 12 Va. App. 1178, 1183, 409 S.E.2d 16, 19 (1991) (finding that, despite the efforts made by the mother to meet the goals set out by the foster care plan, the mother "had not progressed to a point where she was capable of functioning as an independent parent").

Accordingly, we cannot say the trial court's decision terminating mother's residual parental rights to L.B. under Code § 16.1-283(C)(2) was plainly wrong or without evidence to support it.

For these reasons, we affirm the trial court's decision.

Affirmed.