COURT OF APPEALS OF VIRGINIA


Present:  Chief Judge Fitzpatrick, Judge Elder and
          Senior Judge Coleman
Argued at Salem, Virginia


L.G.
                                          OPINION BY
v.   Record No. 2443-02-3        JUDGE SAM W. COLEMAN III
                                          JUNE 10, 2003
AMHERST COUNTY DEPARTMENT
 OF SOCIAL SERVICES


            FROM THE CIRCUIT COURT OF AMHERST COUNTY
                   J. Michael Gamble, Judge

        Herbert E. Taylor, III, for appellant.

        J. Thompson Shrader (Jennifer R. Tuggle;
        J. Thompson Shrader & Associates, P.C., on
        brief), for appellee.

        Ruth B. Layne (De Bruin & Layne, P.C., on
        brief), Guardian ad litem for L.G.

        Grady W. Donaldson, Jr. (Schenkel &
        Donaldson, P.C., on brief), Guardian ad
        litem for the child.


     L.G. appeals a decision of the circuit court (the trial

court) terminating her parental rights to her daughter, K.,

pursuant to Code § 16.1-283(C)(2).  The court found (1) that

L.G. was unwilling or unable, without good cause, within a

reasonable period of time not to exceed twelve months from the

date her daughter was placed in foster care to remedy

substantially the conditions that led to the foster care

placement and (2) that termination was in the child's best

interests. We conclude that the trial court erred by considering only L.G.'s efforts during the twelve-month period following the foster care placement in November 1999 through November 2000, and by not considering what progress, if any, L.G. had made toward remedying those conditions during the twenty-one-month time period between November 2000 and the circuit court hearing in August 2002. Accordingly, we reverse the decision of the trial court and remand for further consideration in accordance with this opinion.

BACKGROUND

According to well established principles, we view the evidence in the light most favorable to the prevailing party, granting to the evidence all reasonable inferences fairly deducible therefrom. Martin v. Pittsylvania County Dep't of Soc. Servs., 3 Va. App. 15, 20, 348 S.E.2d 13, 16 (1986).

L.G. was born in June 1985 and resided with various family members, including her grandmother and mother, until she was twelve or thirteen years old. She reported being raped on three different occasions beginning when she was ten years old. On the third occasion, when L.G. was twelve-and-one-half years old, she was raped by her aunt's boyfriend and four of his friends, one of whom is the father of L.G.'s daughter K. The Amherst County Department of Social Services (DSS) removed L.G. from her mother's

-

custody, and, in December 1998 when L.G. was thirteen years old, she gave birth to K.

L.G. and K. resided in several foster homes from December 1998 until June 1999. During that time, L.G. received parenting classes and counseling related to sexual abuse and neglect. In June 1999, DSS placed L.G. and K. in L.G.'s mother's home where L.G. received some in-home services. While there, L.G. continued to be sexually active and did not comply with the rules established by DSS. In September 1999, L.G. notified DSS that she was pregnant again. L.G. elected to terminate that pregnancy. In November 1999, L.G. stole her mother's car and was in a traffic accident while K. was seated in the backseat of the car.

In November 1999, and as a result of these events, DSS obtained custody of K. based on a finding of child neglect, and DSS placed both L.G. and K. with a foster family. L.G. experienced problems with the foster family, and, in January 2000, DSS placed L.G. with the Virginia Baptist Children's Emergency Shelter in Salem, but left K. with the foster family.

After three months in Salem and due to additional problems there, DSS moved L.G. to the Presbyterian Home in Lynchburg. L.G. ran away from the Presbyterian Home several times, once staying away for over two months. In November 2000, DSS placed L.G. at Tekoa, a residential facility in Christiansburg. When L.G. first

arrived there, she exhibited oppositional behavior and she also ran away from the facility.

On November 14, 2000, DSS filed the petition to terminate L.G.'s parental rights.

Starting in January 2001, the foster family brought K. to Tekoa to visit with L.G. every other Sunday afternoon. However, because L.G. ran away from the facility, DSS suspended her visitation with the child due to safety concerns. L.G. returned to Tekoa in March 2001. Visitation with K. resumed for a period of time, but DSS again suspended the visitation in January 2002 when the juvenile and domestic relations district court (JDR court) terminated L.G.'s parental rights to K. L.G. appealed the JDR court termination order to the trial court.

On August 12, 2002, the trial court held a de novo hearing on the petition to terminate L.G.'s parental rights to K. At the time of the hearing, L.G. was seventeen years old. Several witnesses testified about L.G.'s progress since March 2001 when she returned to the program at Tekoa. Mark Bond, who taught L.G. English and history at Tekoa, stated that, although L.G. has a learning disability and struggles with educational endeavors, she works hard to compensate, is often on the A-B honor roll, and will receive a high school diploma. Following graduation from high school, L.G. plans to attend a community college and attain a career in education or as a parole officer.

-

Bond stated that L.G. has focused her work and her goals toward having K. returned to her. L.G. set goals to save money or to spend her money on clothes or toys for K. L.G. has "remained adamant that she wants to be reunited with K. She has set a goal to be a wonderful mother for K. and to get her college degree and to be there for [K]." All of her goals are oriented toward K., who is a "priority" in L.G.'s life.

Cindy Fairchild, who has counseled L.G. while she has been at Tekoa, testified that L.G. "has been committed to working on her issues." Fairchild testified that L.G. did not receive sufficient stimulation in her early childhood and, as a result, that she has several "deficits." However, L.G. compensates for her deficits through hard work and determination and has "made incredible progress in all areas and settings," including social skills and psychological issues. Fairchild stated that in her twenty years of experience with adolescents, L.G. "has made the most remarkable progress." "It seems like a light went on." L.G. has "excelled" in school and in her employment at a fast food restaurant, where she is one of the most admired employees. L.G. is also revered by her peers, "has excellent boundaries," and connects well with adults. L.G. "does a tremendous job of long and short term goal setting and planning." Fairchild described L.G. as "polite and a caring, sensitive, intelligent and remarkable young woman."

Fairchild opined that L.G. is "strongly motivated" by K. and wants to be reunited with her. Fairchild believes K.'s best interests would be served by having a parent-child relationship with L.G. Fairchild opined that L.G. is ready to have K. live with her and that she is capable of attending classes, working, and taking care of K. Fairchild also testified that L.G.'s former counselor shares in Fairchild's assessment of L.G.

L.G. testified and acknowledged that she has made mistakes in the past but stated that she has learned how to be responsible and respectful. She testified that she is committed to changing her life and that K. is her most important concern.

At the time of the hearing, L.G. was scheduled to be discharged from Tekoa in June 2003 and to go into independent living or a foster home.

The trial court ruled "that the fact that . . . L.G. has recently been doing much better was not relevant to the case . . . . [And, the fact that she] had failed to make substantial progress which was required by the child's foster care plan within the time limits or goals as set forth in that plan" established "by clear and convincing evidence that it is in the best interest of [K.] . . . to terminate the parental rights of . . . L.G." pursuant to Code § 16.1-283(C)(2). The court expressly found that DSS did not establish by clear and convincing evidence a cause to terminate pursuant to Code § 16.1-283(B)(2), which provides for

-

termination if the abuse or neglect has continued and presents a serious and substantial threat to the life, health or development of the child and it is not reasonably likely that the conditions could be substantially corrected or eliminated within a reasonable time.

ANALYSIS

> Code § 16.1-283(C) speaks in the conjunctive.  The court must find, upon clear and convincing evidence, (1) that termination is in the best interests of the child and (2) that
>
> "[t]he parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed twelve months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end. . . ."

Roanoke City Dep't of Soc. Servs. v. Heide, 35 Va. App. 328, 335-36, 544 S.E.2d 890, 893 (2001) (quoting Code § 16.1-283(C)).

The twelve-month time limit established by Code § 16.1-283(C)(2) was designed to prevent an indeterminate state of foster care "drift" and to encourage timeliness by the courts and social services in addressing the circumstances that resulted in the foster care placement.  "This provision protects the family unit and attendant rights of both parents and child, while assuring resolution of the parent/child relationship

-

without interminable delay."  Lecky v. Reed, 20 Va. App. 306, 312, 456 S.E.2d 538, 540 (1995).  The legislation established a reasonably presumptive time frame of twelve months for parents to receive rehabilitative services to enable them to correct the conditions that led to foster care placement.  "The statute clearly contemplates that efforts to resolve the 'conditions' relevant to termination are constrained by time."  Id.  If the parent fails to substantially remedy those conditions within twelve months the court may act to prevent the child from lingering in foster care.  "Absent 'good cause,' a parent or parents receiving the 'reasonable and appropriate' services of 'rehabilitative agencies' must 'remedy substantially' the 'conditions which led to . . . foster care' of the child in a 'reasonable period not to exceed twelve months.'"  Id.

The time limit does not, however, temporally restrict the trial court's consideration to events that occurred between the parent and child only during that discrete twelve-month time period to the exclusion of what may have occurred before and after those dates.  See Heide, 35 Va. App. at 337, 544 S.E.2d at 894.  Such a construction of the statute

> would deny the fact finder the opportunity to evaluate the present best interests of the child.  The trial court may discount the parent's current "progress" if the best interests of the child would be served by termination.  However, . . . the trial court may determine that a parent's delayed, but

-

> nonetheless substantial, progress may
> overcome the time delay.  We will not
> deprive the trial court of the opportunity
> to weigh the rights of the parents and the
> best interests of the child.

Id. (emphasis added).

Here, K. was placed in foster care in November 1999 when she was one year old.  Thus, the twelve-month time period provided by Code § 16.1-283(C)(2), within which the parent is expected to remedy substantially the conditions that led to the foster care placement, elapsed in November 2000.  The history of this case shows that from the date of K.'s birth in December of 1998, at which time L.G. was thirteen years old, until November 2000, L.G. continued to exhibit irresponsible and unstable behavior and a total lack of commitment to providing acceptable parenting for K.  Throughout this time period, L.G. was in successive foster care homes or facilities due either to her unacceptable behavior, or problems with her caretakers, or a combination thereof.  L.G. was raped several times before she was thirteen years old and after DSS intervened and placed her in relatives' homes.  She later became sexually active and became pregnant again.  In each of the foster care settings, she failed to adhere to DSS's rules and ran away on at least six occasions in the six months between July 8, 2000, through January 28, 2001.  Clearly, during the first twelve-month period that K. was removed from L.G.'s custody and placed in separate foster care,

L.G. did little or nothing to remedy the conditions that led to and caused the abuse or neglect which led to the separation in the first instance.

However, based upon the evidence before the JDR court in September 2001 and the circuit court in August 2002, beginning around November 2000, while at Tekoa and when L.G. was fifteen years old, L.G. made tremendous progress in her education, social skills, and in coming to terms with her abusive past and related issues. At the time of the hearing, and for twenty-one months before that date, L.G. had made significant improvements in her education and life skills; she had either substantially addressed or resolved many of her psychological issues; and she had made considerable progress toward establishing stability in her life. According to the testimony of several of her counselors, L.G. has made remarkable changes in her life and has matured into a responsible young adult. One of the counselors who was familiar with L.G.'s experience at Tekoa testified that she believed L.G. is ready to resume a parental role in K.'s life. The counselor also opined that it would be in the best interests of both K. and L.G. that L.G.'s parental rights not be terminated. The guardian ad litem for L.G. filed a brief in support of L.G.'s position that the trial court erred in terminating her parental rights.

-

Nevertheless, the trial court determined this evidence was irrelevant and did not consider it in determining whether L.G. had substantially remedied the conditions which led to or required continuation of the child's foster care placement and whether termination of the parental relationship was in the child's best interest. Given L.G.'s age and background, in particular the sexual abuse she experienced while living with family members and her subsequent placement in ten foster homes or residential programs over a two-year period, had the trial court considered this evidence it may well have concluded either that (1) good cause existed for L.G.'s not having corrected the conditions within the statutory twelve-month time period, and/or (2) that termination was no longer in the best interests of K. or L.G. because L.G. had substantially remedied many of the conditions that led to the foster care placement.

Because the trial court did not consider significant relevant evidence concerning whether, at the time of the hearing, L.G. had made substantial progress in correcting the conditions that led to the foster care placement and whether termination of L.G.'s parental rights was in K.'s present best interests, we reverse the trial court's determination and remand the matter to the trial court to consider L.G.'s progress, not only during the twenty-one-month time period prior to the August

-

2002 trial court hearing but also through the time of the remand hearing.

Reversed and remanded.