COURT OF APPEALS OF VIRGINIA


Present:    Judges Elder, Clements and Senior Judge Annunziata


GAIL ANDREWS

MEMORANDUM OPINION[*]

v.      Record No. 1562-07-3                               PER CURIAM
                                                    JANUARY 22, 2008

ROANOKE CITY DEPARTMENT OF
  SOCIAL SERVICES


FROM THE CIRCUIT COURT OF THE CITY OF ROANOKE
William D. Broadhurst, Judge

(Sarah Jane Wells; Warner & Renick, PLC, on brief), for appellant.
Appellant submitting on brief.

(William M. Hackworth, City Attorney; Heather P. Ferguson,
Assistant City Attorney, on brief), for appellee.  Appellee
submitting on brief.

(Eric Roland Spencer, on brief), Guardian *ad litem* for minor
children.  Guardian *ad litem* submitting on brief.


Gail Andrews, mother, appeals the circuit court's decision dated June 11, 2007,

terminating her parental rights to her four minor children, R.W., Jr., R.W., E.A., and N.A.[1]  On

appeal, she contends the evidence was insufficient to support the termination pursuant to Code

§ 16.1-283(B) and 16.1-283(C)(2) because it failed to prove (1) it was not reasonably likely that

the conditions which resulted in the neglect or abuse suffered by her children can be substantially

corrected or eliminated so as to allow the children's safe return to her within a reasonable period

of time; (2) she, without good cause, was unable to remedy substantially the conditions which

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] While the Roanoke City Department of Social Services (DSS) had custody of mother's
fifth child, J.W., he was not part of the termination proceedings.

led to and required continuation of foster care for her children for a period in excess of twelve months, notwithstanding the reasonable and appropriate efforts of social, medical, mental health, and other rehabilitative agencies; and (3) termination of her parental rights was in the best interests of her children.[2]

Upon reviewing the record and briefs of the parties, we affirm the circuit court's decision.

Background

We view the evidence in the light most favorable to the prevailing party below and grant to it all reasonable inferences fairly deducible therefrom. See Logan v. Fairfax County Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 462 (1991).

So viewed, the evidence proved that at the time of the circuit court hearing on March 21, 2007, the ages of mother's four children were as follows: R.W., Jr. - - fourteen, R.W. - - thirteen, E.A. - - six, and N.A. - - four.

Mother began receiving services for her children as early as 1998 through CHIP (Child Health Investment Partnership), including parenting education, medical support for her children, transportation, mental health case management, and referrals for additional services. Notwithstanding the provision of those services, mother's family remained in crisis mode, and she failed to demonstrate the ability to implement medical care and meet the specific needs of each child.

Mother and her children first came to the attention of DSS in September 2001, when DSS received a complaint alleging physical neglect and inadequate or dangerous shelter. At that time, the children were found under a bridge, where mother had left them while she looked for a hotel.

---

[2] In the "Conclusion" section of her opening brief, mother makes an argument regarding the propriety of terminating her parental rights under Code § 16.1-283(C)(1). However, the trial court did not terminate mother's parental rights under that section. Rather, it terminated her parental rights under Code § 16.1-283(B) and 16.1-283(C)(2). Therefore, we consider only mother's arguments with respect to those two code sections.

The complaint was founded, and, as a result, DSS facilitated the placement of mother and her children at the Transitional Living Center.

In October 2003, Dr. Jennifer Morrow, a psychologist, began working with mother and her family to improve mother's parenting skills and stop any ongoing abuse. Dr. Morrow noticed that mother was nurturing with infants, but as soon as the child reached about one year old, mother became cold, critical, detached, and emotionally and verbally abusive. Dr. Morrow did not believe mother had any intellectual deficits that prevented her from learning parenting techniques, rather she either chose not to or was compulsively driven to act in a certain manner. Dr. Morrow's initial in-home services ended in April 2004.

The next complaint came to DSS's attention on November 15, 2004. It alleged physical neglect and lack of supervision due to J.W.'s older brother, Eric Andrews, abusing J.W. in the home. That complaint was founded, and DSS referred the family to DePaul in-home services, and entered into a "Safety Plan" with mother dated November 15, 2004. The safety plan required that J.W. not be around Eric without appropriate supervision or left in Eric's care and that mother arrange appropriate supervision for her children at all times.

On December 14, 2004, DSS entered into a "Client Motivational Contract" with mother because of its concerns that she could not protect J.W. from being abused. The contract required that mother (a) not allow known abusers to care for J.W. or be in his presence without appropriate supervision, (b) work with Dr. Morrow and follow her recommendations, (c) ensure appropriate supervision for her children at all times, (d) not allow Eric or mother's niece, Jessica, to care for her children, (e) maintain communication with DSS, DePaul in-home services, and sign all necessary releases, (f) maintain appropriate food in the home, (g) not threaten the children for talking with the counselor or social worker or tell the children that if they are honest

with those workers, they will be removed from the home, and (h) obtain individual counseling for herself.

The next day, December 15, 2004, DSS received a third complaint, which alleged physical neglect and lack of supervision involving R.W., Jr., R.W., N.A., E. A., and J.W. That complaint was founded, and all five children were removed from mother's custody and placed in the temporary legal custody of DSS pursuant to an Emergency Removal Order on December 15, 2004. At that time, mother indicated to DSS and Dr. Morrow that she could not protect the children from further abuse by her older children. The Roanoke Juvenile and Domestic Relations District Court ("the J & DR court") found the children to be abused and neglected, ordered mother to undergo a psychological evaluation, and scheduled a dispositional hearing for February 23, 2005.

Dr. Morrow again began providing in-home services to mother. During the time Dr. Morrow worked with mother, Dr. Morrow either witnessed third-party abusers being a danger to mother's children or mother told Dr. Morrow that she knew these persons were a danger to her children. Dr. Morrow stated that at times, the children were hungry, and she saw mother arbitrarily punish them. In addition, mother showed cognitive confusion regarding herself versus the children. On several occasions, R.W., Jr. and R.W. told Dr. Morrow and their teachers that they would be punished if they asked for help to protect themselves. On one occasion, when Dr. Morrow confronted mother with a situation where mother's older son, who had previously sexually abused R.W., had piled his belongings in front of R.W.'s bedroom door preventing access to the bedroom, mother refused to make the son remove his belongings. Dr. Morrow observed constant verbal and emotional abuse to R.W., Jr. and R.W. Dr. Morrow opined that protection of the children could not be effectively accomplished through in-home

services and that mother's "character disorder" prevented her from ever implementing the parenting techniques shown to her.

On February 23, 2005, the J & DR court entered a Dispositional Order For Underlying Petition for Foster Care Plan following a hearing, which transferred custody of the children to DSS. The J & DR court found that continued placement in mother's home would be contrary to their welfare and that reasonable efforts had been made to prevent removal from the home. The J & DR court approved the February 4, 2005 initial foster care plan with a goal of return home and reasonable visitation for mother. Pursuant to the plan, in order to achieve the goal of return home, mother needed to obtain a stable source of income for a significant period of time; obtain and demonstrate the ability to maintain safe, clean, stable, and affordable housing for an extended period of time; complete a psychological evaluation and any recommended treatments; improve her reading and writing skills; demonstrate appropriate clear and consistent boundaries for her children; learn appropriate parenting skills and better judgment and decision making skills to prevent putting her children at risk for harm; complete parenting classes; and keep and maintain visitation with the children.

On December 5, 2005, Peter Cardillo, mother's foster care worker, entered into a "Master Service Plan" with her, with the goal of return home. That plan required that mother attend all scheduled visitation with her children; complete a "second round" of parenting classes; continue to work with Literacy Volunteers on her reading and math skills; complete a new psychological evaluation[3]; and provide Cardillo with employment verification.

---

[3] Dr. Doris Nevin performed mother's first psychological evaluation on March 18 and April 3, 2004. Dr. Nevin noted that mother's children's behavior was out of control in the waiting room and that mother approached various persons trying to elicit help with the children. Dr. Nevin diagnosed mother with parent-child problems, borderline intellectual functioning, and a possible dependent personality disorder. According to Dr. Nevin, mother's full scale IQ is 69 and will not likely increase over time. Thus, Dr. Nevin expressed concerns about mother's ability to manage her own affairs, as well as, engage in child rearing. Dr. Nevin opined that

Mother complied with obtaining the psychological evaluation. Dr. Debra Marks, a licensed clinical psychologist, who performed the evaluation on February 11, 2005, noted that mother is a survivor of multiple childhood traumas, including sexual abuse, domestic violence, and severe family instability. Dr. Marks noted that "[r]egarding parenting issues, [mother] will be challenged to make good choices regarding her children, and to effectively manage crises as needed." Dr. Marks diagnosed mother as suffering from posttraumatic stress disorder, chronic, childhood onset, dysthmic disorder (low-grade, chronic depression), and learning disabilities related to reading comprehension. Dr. Marks recommended that mother complete a parenting/nutrition class, attend individual counseling, be provided in-home services for a more hands-on approach, and that communication with her be presented in very concrete language and in writing with the instructions and expectations reviewed several times. When Dr. Marks testified at the circuit court hearing, she believed that mother would require a capable adult to provide in-home assistance with parenting.

Mother participated in individual counseling first with Latonia Bolden, and then with Sandy Sheldon. Eventually that counseling was performed on an as-needed basis only. Sheldon wrote in a letter, dated January 22, 2007, that she had counseled mother since February 2006, and found mother to be honest, responsible, and cooperative. Sheldon wrote that mother had taken a parenting class, obtained tutoring for math and reading, secured employment, and attended individual counseling sessions.

The evidence showed that mother obtained a few jobs throughout the time the children remained in foster care. In addition, she had lived in a four-bedroom apartment during that time, and her rent ranged from $50 to $70 per month.

mother was unable to set appropriate boundaries within the home, and expressed concern with the type of attachment or lack thereof that mother formed with her children.

The evidence also showed that mother was consistent with her visitation with the children. However, during visits with the children between October 2005 and March 2006, Cardillo observed mother's inability to control the children. Cardillo stated that mother failed to interact with the children, and when DSS and the in-home worker encouraged mother to do so, she failed to respond. Cardillo explained that mother participated in the services provided to her, but she was never able to demonstrate that she successfully mastered the skills necessary to resolve the reasons her children came into foster care. Cardillo contended that mother did not "successfully" complete the parenting class because there were concerns as to her level of understanding of the materials presented. The parenting class facilitator offered to meet with mother one-on-one, but mother did not take advantage of that offer.

Georgia Sweetenberg, an in-home worker, first began working with mother in April 2006. Sweetenberg attended mother's visitations with the children at DSS and also went to mother's home to work with her. During the visits with the children, Sweetenberg observed that mother did not correct them when they hit each other and fought. Rather, Sweetenberg or the older children intervened. Sweetenberg tried to assist mother with disciplining the children, but mother failed to implement those skills. As of May 2006, the goal for the children was still return home, and DSS continued to work with mother in meeting the goals previously established for her.

Beginning in June 2006, the children had some extended visits in mother's home while Sweetenberg was present. During those visits, there was little structure in the home, the older children ran back and forth upstairs, and the younger children exhibited fighting and behavior problems. Sweetenberg tried to teach mother appropriate ways to handle the children, with little success. Sweetenberg worked with mother until November 2006, but she did not believe at that time that mother had progressed enough for the children to return home.

Pursuant to Foster Care Service Plans filed November 3, 2006 for the children, DSS changed the goal to adoption and requested a permanency planning hearing. The plans focused on mother's difficulties with parenting issues, relying on the opinions and reports of Bolden, Sweetenberg, and Dr. Marks. The plans also noted that further complicating matters, mother's boyfriend, who resided with her and is the father of her eighth child, had not been actively participating in services. He had not developed any meaningful relationship with the children, and had not been pursuing employment. The plans noted that mother had not demonstrated that she is able to make daily and safe decisions for her children. DSS filed petitions for termination of mother's parental rights to R.W., Jr., R.W., E.A., and N.A. On December 7, 2006, the J & DR court approved the goal of adoption and terminated mother's parental rights to her four children.

At the circuit court hearing, mother admitted she needs "extra help" to adequately parent her children, and contended her boyfriend would provide that help. While mother had worked at a few jobs in the past, she admitted that as of March 2007, she was unemployed. Mother denied ever physically or verbally abusing her children, stating that others had done so. Mother believed that her children's behavioral, emotional, and developmental problems were due to them wanting to come home or the influence of their foster parents.

All of the children have special needs, which require services, due to developmental delays, mental health issues, and problems in school. Dr. Nevin opined that R.W., Jr. "is a child with significant and complex symptoms of mental illness," who needs a structured living environment, consistent interaction with services, and a structured school program. Dr. Nevin opined that to place R.W., Jr. back in an unsafe living situation or where previous trauma occurred would increase and negatively impact his symptoms. R.W.'s play therapist described R.W., who has a mentor due to her low self-esteem and poor social skills, as emotionally "shut-down" when her treatment first started. The play therapist opined that R.W. needs a home

where she feels safe and secure and where her needs are met. The play therapist indicated that R.W. feels good about her current foster home.

## Analysis

The Supreme Court of Virginia has recognized the need to "respect . . . the natural bond between children and their natural parents." Weaver v. Roanoke Dep't of Human Res., 220 Va. 921, 926, 265 S.E.2d 692, 695 (1980). When considering termination of a parent's residual rights to a child, "the paramount consideration of a trial court is the child's best interests." Logan, 13 Va. App. at 128, 409 S.E.2d at 463. "'[T]ermination of [residual] parental rights is a grave, drastic, and irreversible action.'" Helen W. v. Fairfax County Dep't of Human Dev., 12 Va. App. 877, 883, 407 S.E.2d 25, 28-29 (1991) (quoting Lowe v. Dep't of Pub. Welfare of the City of Richmond, 231 Va. 272, 280, 343 S.E.2d 70, 72 (1986)). On review, "[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests." Farley v. Farley, 9 Va. App. 326, 329, 387 S.E.2d 794, 795 (1990). "The trial court's judgment, when based on evidence heard *ore tenus*, will not be disturbed on appeal unless plainly wrong or without evidence to support it." Logan, 13 Va. App. at 128, 409 S.E.2d at 463.

Code § 16.1-283 provides for the termination of residual parental rights under carefully defined circumstances. Here, the trial court concluded that the evidence warranted termination of mother's residual parental rights to her four children on alternative grounds, i.e., under subsections (B) and (C)(2) of Code § 16.1-283.

Where a trial court's judgment is made on alternative grounds, we need only consider whether any one of the alternatives is sufficient to sustain the judgment of the trial court and, if we so find, need not address the other grounds. See Boone v. C. Arthur Weaver Co., 235 Va. 157, 161, 365 S.E.2d 764, 766 (1988).

Code § 16.1-283(C)(2) requires proof, by clear and convincing evidence, that (1) the termination is in the best interests of the child, (2) "reasonable and appropriate" services have been offered to help the parent "substantially remedy the conditions which led to or required continuation of the child's foster care placement," and (3) despite these services, the parent has failed, "without good cause," to remedy those conditions "within a reasonable amount of time not to exceed twelve months from the date the child was placed in foster care." In addition, "[t]he court shall take into consideration the prior efforts of such [agency] to rehabilitate the parent . . . prior to the placement of the child in foster care." Id.

In determining what is in the child's best interests, a court must evaluate and consider many factors, including the child's age and physical and mental condition, the parent's age and physical and mental conditions, the relationship between the child and parent, the child's needs, and the role the parent has and will play in the child's upbringing. Barkey v. Commonwealth, Alexandria Dep't of Human Servs., 2 Va. App. 662, 668, 347 S.E.2d 188, 191 (1986).

"The twelve-month time limit established by Code § 16.1-283(C)(2) was designed to prevent an indeterminate state of foster care 'drift' and to encourage timeliness by the courts and social services in addressing the circumstances that resulted in the foster care placement." L.G. v. Amherst County Dep't of Soc. Servs., 41 Va. App. 51, 56, 581 S.E.2d 886, 889 (2003).

> The legislation established a reasonably presumptive time frame of twelve months for parents to receive rehabilitative services to enable them to correct the conditions that led to foster care placement . . . . If the parent fails to substantially remedy those conditions within twelve months the court may act to prevent the child from lingering in foster care.

Id. at 57, 581 S.E.2d at 889.

The record contains credible evidence to support the circuit court's finding that termination is in the best interests of R.W., Jr., R.W., E.A., and N.A. and that the requirements of Code § 16.1-283(C)(2) have been proven.

- 10 -

Mother's parental rights were terminated because of her lack of progress within a reasonable amount of time in remedying the circumstances that led to the children's removal from her care. The children had been in foster care for approximately twenty-seven months at the time of the circuit court hearing. While mother participated in the services offered to her by DSS, maintained employment at times, and had housing, clear and convincing evidence proved that additional time would not remedy her level of functioning as a parent nor her inability to ensure the health, safety, and well-being of her children. "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming [her] responsibilities." Kaywood v. Halifax County Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990).

Furthermore, nothing in the record suggests continued services would alleviate mother's deficits. The testimony before the circuit court was to the contrary. Clear and convincing evidence established that mother had not progressed to the point where she was capable of adequately parenting her children and providing them a safe and secure home environment. See Jenkins v. Winchester Dep't of Soc. Servs., 12 Va. App. 1178, 1183, 409 S.E.2d 16, 19 (1991) (finding that, despite the efforts made by the mother to meet the goals set out by the foster care plan, the mother "had not progressed to a point where she was capable of functioning as an independent parent").

Thus, under the facts of this case, we cannot say the circuit court's decision terminating mother's residual parental rights to R.W., Jr., R.W., E.A., and N.A. under Code § 16.1-283(C)(2) was plainly wrong or without evidence to support it.

For these reasons, we affirm the circuit court's decision.

Affirmed.

- 11 -