COURT OF APPEALS OF VIRGINIA


Present:    Judges Humphreys, Beales and Senior Judge Fitzpatrick


LATRICIA PORTER

                                                    MEMORANDUM OPINION[*]
v.        Record No. 1787-07-3                            PER CURIAM
                                                      FEBRUARY 5, 2008
ROANOKE CITY DEPARTMENT
   OF SOCIAL SERVICES


FROM THE CIRCUIT COURT OF THE CITY OF ROANOKE
Charles N. Dorsey, Judge

(James P. Cargill; Law Office of James P. Cargill, P.C., on brief), for
appellant.  Appellant submitting on brief.

(William M. Hackworth, City Attorney; Heather P. Ferguson,
Assistant City Attorney; Phillip R. Lingafelt, Guardian *ad litem* for
the infant child; Glenn Feldman Darby Goodlatte, on brief), for
appellee.  Appellee and Guardian *ad litem* submitting on brief.


Latricia Porter appeals the termination of her parental rights to her son pursuant to Code

§ 16.1-283(B) and 16.1-283(C)(2).  Porter argues that the Roanoke City Department of Social

Services (DSS) violated her due process right by failing to provide reasonable and appropriate

services for her special needs and that the evidence was insufficient to support DSS's allegations

against her.  We disagree and affirm the trial court.

BACKGROUND

As required, we view the evidence in the light most favorable to the prevailing party

below and grant to it all reasonable inferences fairly deducible therefrom.  See Logan v. Fairfax

County Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 462 (1991).  So viewed,

the evidence proved that T.P. was born on December 7, 2004 when Porter was a minor.  On March

_____

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

30, 2005, Shauna Bryant, a child protective services investigator, received a complaint that Porter was not properly caring for T.P. by yelling at him and by handling him roughly. Bryant referred Porter for services at the health department and for services at Child Health Investment Partnership. On April 28, 2005, DSS received a second complaint that Porter and Porter's mother, Ms. Carter, were fighting about the care of T.P. Bryant determined it was not safe for Porter, who was then seventeen years old, to remain with Carter, and DSS removed Porter from Carter's custody. Porter and T.P. were placed in the same foster home. At the subsequent preliminary removal hearing, custody of Porter was returned to Carter.

During the short time Porter was in foster care, DSS received a complaint on May 2, 2005 alleging physical neglect of T.P. by Porter. T.P. had eczema; Porter failed to apply the necessary prescribed medication, and T.P. developed a secondary skin infection. Porter also had difficulties measuring the correct amount of water and formula when she made T.P. a bottle, and she could not remember how often she needed to feed T.P. Porter had also continued to yell at T.P. Although Porter was open to redirection, Bryant believed Porter did not retain the information regarding the care and feeding of T.P. A complaint was founded against Porter for physical neglect.

On June 11, 2005, the Roanoke City police notified DSS of a physical altercation between Porter and Carter. Porter, who was still a minor, refused to stay with Carter. DSS responded and found Porter "out of control" and refusing to comply with its requests regarding T.P. Porter was unable to identify a plan as to where she and T.P. would stay as she left Carter's house. Believing T.P. was in danger, DSS removed T.P. from Porter's custody and removed Porter from Carter's custody. Porter and T.P. were placed in the same therapeutic foster home in order for Porter to continue to parent T.P. The initial goal of the foster care service plan was return to parent. The service plan required Porter to participate in individual counseling, to successfully complete parenting classes and anger management classes, to comply with other services assessed by DSS,

- 2 -

and to complete a psychological evaluation. DSS referred Porter to Blue Ridge Behavioral Healthcare for mental retardation services, to Piedmont Community Services for psychiatric treatment, and to the Department of Rehabilitative Services for employment counseling.

Nancy Majors, the foster care worker for Porter and T.P., testified Porter complied with some of the requirements of the service plan. Although Porter completed the parenting class, the instructor of the class reported that Porter seemed more interested in the clothing and grooming of other individuals in the group rather than with the content of the program. Porter never informed the instructor that she did not understand the material, and Porter never asked the instructor for additional assistance. Porter completed anger management classes and attended individual counseling. Majors never received any feedback that Porter had difficulty with the classes or counseling. At the termination hearing, Majors testified she could not think of any other services that DSS could have provided to Porter. Majors explained that T.P.'s father had limited cognitive abilities and he was provided services at East Hornbeck Services, but Porter was not referred to East Hornbeck Services because DSS provided Porter with one-on-one services at a therapeutic foster home.

Ruby Wade, the therapeutic foster mother, understood that she was to work with Porter and to teach Porter to care for T.P. Porter moved into Wade's home in June 2005, and Wade worked with Porter one-on-one. Wade showed Porter how to properly mix formula, instructed her on the appropriate amount and frequency for feeding T.P., showed her how to apply T.P.'s medication, showed her how to give T.P. a bath, and showed her how and when to change T.P.'s diaper. Wade testified Porter was resistant to her help and would curse her. Wade knew Porter had limited cognitive abilities and she demonstrated to Porter exactly what needed to be done to care for T.P., but Porter was unable to follow the directions. Wade testified one time Porter was on the telephone when she left T.P. unsupervised on a bed and T.P. fell off the bed. Porter also used an entire tube of

medication for T.P.'s eczema in two days when the tube was meant to last thirty days. Porter also gave T.P. medication for acid reflux. When Wade questioned Porter about the dose, Porter stated she gave the recommended dose, but Porter failed to realize the dose she gave T.P. was an adult dose. Wade realized she was not helping Porter, and Porter left Wade's house in October 2005.

After Porter left Wade's home, she received mentoring services from DSS until March 2006 when Porter turned eighteen and emancipated herself from foster care. On July 25, 2006, Majors provided transportation for Porter's initial appointment at the Department of Rehabilitative Services, but Porter was not home. Porter did not attend a rescheduled appointment on August 15, 2006, and she told Majors that she had been drinking at a motel the night before. After Porter left foster care, she missed six scheduled supervised visits with T.P., and when Porter did visit T.P., Majors had to redirect Porter's behavior and Porter frequently talked on her cell phone and did not interact with T.P.

T.P. has cerebral palsy, a seizure disorder, developmental delays, an astigmatism, a hearing problem, eczema, and a tear duct deformity. T.P.'s medical needs require several therapies and medications, and he has medical appointments at least once a week. Porter testified she thought that T.P. needed speech therapy every six months and was unsure how often he required physical therapy for his cerebral palsy. Once during a supervised visit, Porter asked Majors if T.P. still had cerebral palsy.

Dr. Doris Nevin completed a psychological evaluation of Porter and diagnosed her with mild mental retardation and impulse disorder. Dr. Nevin testified unless someone assisted Porter as a co-parent, given the special needs of T.P. and her cognitive limitations, it was unlikely Porter would ever be able to parent T.P.

ANALYSIS

I.

Porter argues her right to due process was violated when the trial court terminated her rights under Code § 16.1-283(C)(2) because DSS failed to provide her with reasonable and appropriate services for a mentally challenged individual. Porter contends DSS should have offered her one-on-one services devised for a mentally challenged individual.

Code § 16.1-283(C)(2) provides, in pertinent part:

> The residual parental rights of a parent . . . of a child placed in foster care . . . may be terminated if the court finds . . . that is in the best interests of the child and that:
>
> \* \* \* \* \* \* \*
>
> 2. The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed twelve months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.
>
> Subsection C(2) specifically requires a showing that DSS has provided "reasonable and appropriate" services to a delinquent parent prior to terminating his rights. In this way, the statute establishes a time frame after the child has entered foster care for the parents "to receive rehabilitative services to enable them to correct the conditions that led to foster care placement."

Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 269, 616 S.E.2d 765, 771 (2005) (quoting L.G. v. Amherst County Dep't of Soc. Servs., 41 Va. App. 51, 57, 581 S.E.2d 886, 889 (2003)). "'Reasonable and appropriate' efforts can only be judged with reference to the circumstances of a particular case. Thus, a court must determine what constitutes reasonable and appropriate efforts given the facts before the court." Ferguson v. Stafford County Dep't of Soc. Servs., 14 Va. App. 333, 338, 417 S.E.2d 1, 4 (1992).

"The trial court's judgment, 'when based on evidence heard *ore tenus*, will not be disturbed on appeal, unless plainly wrong or without evidence to support it.'" Logan, 13 Va. App. at 128, 409 S.E.2d at 463 (quoting Peple v. Peple, 5 Va. App. 414, 422, 364 S.E.2d 232, 237 (1988)).

DSS referred Porter to Blue Ridge Behavioral Healthcare for mental retardation services, to Piedmont Community Services for psychiatric treatment, and to the Department of Rehabilitative Services for employment counseling. DSS provided transportation for Porter for an appointment at the Department of Rehabilitative Services, but Porter was not home. Porter also failed to attend a rescheduled appointment because she had been drinking at a motel the night before the appointment. DSS provided individual counseling, anger management classes to assist with her impulse control issue, and psychiatric medication. DSS provided parenting classes. DSS was never informed that Porter did not understand the material presented in the parenting class, but the instructor informed DSS that Porter seemed more interested in the clothing and grooming of other individuals in the group rather than with the content of the program. Prior to T.P.'s removal, Porter was also provided with services through the Child Health Investment Partnership and with the one-on-one services of Wade, a therapeutic foster mother. Wade worked with Porter for approximately five months, and she demonstrated to Porter basic parenting skills such as how to prepare a bottle and how to change a diaper. Porter did not follow Wade's advice and would curse Wade. After Porter left Wade's home, she was provided with mentoring services with DSS until Porter turned eighteen and emancipated herself from foster care. At the termination hearing, Majors testified she could not think of any other services that DSS could have provided to Porter and explained that Porter was not referred to East Hornbeck Services because she was offered one-on-one parenting with Wade and other supportive services. Based upon a review of the circumstances of this case, DSS provided "reasonable and appropriate" services to Porter and

Porter's right to due process was not violated when the trial court terminated her parental rights pursuant to Code § 16.1-283(C)(2).

II.

Porter argues DSS failed to present clear and convincing evidence to support termination of her parental rights pursuant to Code § 16.1-283(B). She contends DSS failed to prove T.P. suffered either abuse or neglect that presented a serious and substantial threat to his life and that the alleged conditions could not be substantially corrected.

Code § 16.1-283(B) requires proof, by clear and convincing evidence, that

> 1. The neglect or abuse suffered by such child presented a serious and substantial threat to his life, health or development; and
> 2. It is not reasonably likely that the conditions which resulted in such neglect or abuse can be substantially corrected or eliminated so as to allow the child's safe return to his parent or parents within a reasonable period of time. In making this determination, the court shall take into consideration the efforts made to rehabilitate the parent or parents by any public or private social, medical, mental health or other rehabilitative agencies prior to the child's initial placement in foster care.

DSS presented clear and convincing evidence that Porter's neglect of T.P. presented a serious and substantial threat to his life, health or development, and it was not reasonably likely that the conditions could be substantially corrected within a reasonable period of time. When T.P. was four months old, Porter yelled at him and handled him roughly, which included throwing him in the air and catching him. When Porter and T.P. were sent to Wade's therapeutic foster home, she was not feeding T.P. adequately and she did not know when or how to change his diaper. T.P. had eczema, and Porter failed to apply the necessary prescribed medication and T.P. developed a secondary skin infection. Later, while in Wade's home, Porter used a thirty-day supply of a topical medication for T.P.'s eczema in two days. After attending parenting classes, Porter continued to yell at T.P. Porter also left T.P. unsupervised on a bed while she talked on the phone, and T.P. fell off the bed. T.P. has cerebral palsy and, during one supervised visit, Porter

- 7 -

asked if T.P. still had cerebral palsy.  T.P. has several additional medical problems that require special therapies and medications, and he has medical appointments at least once a week.  Porter missed six scheduled supervised visits and missed her appointments at the Department of Rehabilitative Services.  At the termination hearing, Porter admitted she did not know how often T.P. needed physical therapy and thought he needed speech therapy every six months.  Dr. Nevin's psychological evaluation showed that Porter was mildly retarded and suffered from an impulse disorder.  According to Dr. Nevin, unless someone assisted Porter as a co-parent, given the special needs of T.P. and Porter's cognitive limitations, it was unlikely Porter would ever be able to parent T.P.  "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his responsibilities."  Kaywood v. Halifax County Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990).  Based upon the foregoing, the trial court did not err in terminating Porter's parental rights pursuant to Code § 16.1-283(B).

Accordingly, the trial court's decision terminating Porter's parental rights pursuant to Code § 16.1-283(B) and Code § 16.1-283(C)(2) is affirmed.

Affirmed.