COURT OF APPEALS OF VIRGINIA

Present: Judges Humphreys, O'Brien and Senior Judge Bumgardner

HOWARD ALLEN GROFFEL

v.      Record No. 1397-17-2

NEW KENT DEPARTMENT OF
 SOCIAL SERVICES

MEMORANDUM OPINION*
PER CURIAM
MARCH 20, 2018

FROM THE CIRCUIT COURT OF NEW KENT COUNTY
B. Elliott Bondurant, Judge

(Martin Mooradian, on brief), for appellant.

(Andrea G. Erard; Louise A. Moore, Guardian *ad litem* for the minor
children, on brief), for appellee.


Howard Allen Groffel (father) appeals the orders terminating his parental rights to A. and

M. and approving the goals of adoption. Father argues that the trial court erred by terminating his

parental rights to A. and M. pursuant to Code § 16.1-283(B) and (C) because "the initial reason the

children were taken into foster care was resolved, . . . the facts at trial do not support the ruling and

the ruling was contrary to Virginia Code § 16.1-283." Upon reviewing the record and briefs of the

parties, we conclude that this appeal is without merit. Accordingly, we summarily affirm the

decision of the trial court. See Rule 5A:27.

BACKGROUND

"On appeal, 'we view the evidence and all reasonable inferences in the light most

favorable to the prevailing party below, in this case the Department.'" Farrell v. Warren Cty.

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

Dep't of Soc. Servs., 59 Va. App. 375, 386, 719 S.E.2d 329, 334 (2012) (quoting Jenkins v. Winchester Dep't of Soc. Servs., 12 Va. App. 1178, 1180, 409 S.E.2d 16, 18 (1991)).

Father and Lisa Groffel (mother) are married and the biological parents of A. and M. The Department was involved with the family in 2014 due to allegations of inadequate supervision. The Department ultimately closed the case in August 2015.

On November 17, 2015, father called 911 from his car when he was in Fairfax County. When the police arrived, father was disoriented and confused.[1] The police discovered A. and M. in father's car. At the time, A. was seven years old and M. was five years old. Father was transported to a Fairfax hospital, where he stayed for four or five days on a temporary detention order. Since mother was incarcerated at the time and there were no available relatives, the Fairfax County Department of Family Services took custody of the children and placed them in foster care. On November 24, 2015, a family partnership meeting was held. Mother participated and said that she thought it would be best for the children to remain in foster care. She expressed concerns about father's mental health. Father was no longer in the hospital, but he did not attend the meeting. Also, on November 24, 2015, the Fairfax County Juvenile and Domestic Relations District Court made a finding of abuse/neglect and transferred the case to New Kent County. The children came into the Department's care on that same date.

Father subsequently contacted the Department. He called Jon Martz, the director of the Department, on a daily basis, yelling and threatening Martz. Father argued that the Department was violating his civil rights and stealing his children. Father believed that the Department was following him and taking his income. At no time during the first month that the children were in foster care did father ask about their well-being.

---

[1] At the circuit court hearing, father testified that he had a bad reaction to several of his prescriptions interacting with each other.

The Department recommended that father participate in a mental health evaluation, a medical evaluation, substance abuse assessment, anger management assessment, parenting class, and parental coaching. The Department also required father to follow through with any treatment suggested by the assessments. The Department offered in-home support to father, but he refused the services. The Department provided father with gas cards, Food Lion gift cards, and food. The Department assisted father in applying for Medicaid and gave him Rite Aid gift cards to help him purchase his medications.

The Department required father to sign a visitation agreement before he visited with the children. At first, father refused to sign the visitation agreement, so he did not see the children. Father eventually agreed to sign the visitation agreement, so in June and July 2016, the Department arranged for three supervised visits between father and the children. However, the visitations stopped after father refused to follow the terms of the visitation agreement and made inappropriate comments to the children during the visitations. Martz testified that father "wanted to focus on what New Kent had done to him and was unable to focus on the children and how they were doing or the fact that they were separated from him."

On July 14, 2016, Dr. Craig King prepared a psychological evaluation and parenting assessment for father. King attempted to test father, but father refused to cooperate with the testing. Based on the information given to him and his interactions with father, King agreed that a prior diagnosis of father having "unspecified schizophrenia spectrum or other psychotic disorder" appears to be appropriate "until more information is gleaned to more precisely diagnosis [sic] [father's] psychotic disorder." King noted that father's "psychotic disorder makes it very challenging for him to function and take care of his own needs, let alone be responsible for his children." King concluded that father was "not capable of appropriately caring for or parenting two special needs children at this time, and he is very likely a danger to his children."

King further opined that the "prognosis for [father] being able to adequately meet his children's needs and safely parent them is very poor."

In November 2016, father participated in a substance abuse assessment and no services were recommended. Father also presented himself for an anger management intake, but the provider believed that father's mental health issues needed to be addressed before confronting any anger management issues.

On February 2, 2017, father called the New Kent Sheriff's Office and said he had ingested antifreeze. Emergency personnel arrived and transported father to the hospital. Once father was medically cleared, he was transferred to a psychiatric unit because of the attempted suicide. Father told Martz that he did not try to commit suicide, and said that after he had some of his jewelry cleaned, the jeweler put cleaning fluid in one of his medicine bottles, which he drank.[2]

In February 2017, the Department filed petitions to terminate father's parental rights to A. and M.[3] On June 5, 2017, the New Kent County Juvenile and Domestic Relations District Court (the JDR court) entered orders terminating father's parental rights to A. and M. Father appealed the decisions to the circuit court.

While the children remained in foster care, father was arrested and charged with several criminal offenses. On May 19, 2017, the New Kent County Circuit Court convicted father of obstruction of justice and violation of a protective order. On each of the charges, the circuit court sentenced father to twelve months in jail, with six months suspended. The circuit court

---

[2] At trial, father denied telling Martz that he drank jewelry cleaner. Father admitted to drinking antifreeze in a cup of coffee.

[3] The Department also filed petitions to terminate mother's parental rights, and the JDR court terminated mother's parental rights to the children. Mother appealed to the circuit court, which also terminated mother's parental rights to A. and M. Mother appealed the circuit court's rulings to this Court. See L. Groffel v. New Kent Dep't of Soc. Servs., Record No. 1427-17-2.

also ordered him to be placed on probation for three years. At the time of the termination hearing, father was being held without bond on new felony and misdemeanor charges. When asked if he was participating in any services or educational programs at the jail, father responded negatively and stated that he did not plan to participate in any programs.

On August 2, 2017, the parties appeared before the circuit court. Martz testified that father "was unable to take responsibility for anything that had happened." According to Martz, the Department "made countless appointments for him to see different doctors, to see therapists, to see counselors, and he just would not cooperate at all." Father refused to follow through with any of the recommendations made by the Department or counselors. When asked why he thought his children were still in foster care, father testified that there was a "personality conflict" between Martz and him and that "New Kent County has made it their mission to not return [his] children to [him]." The Department asked father about his suicide attempt in February 2017, and father said that he tried to commit suicide because he had a "nervous breakdown due to what New Kent and DSS had [done to him]." Father admitted that it was not his first suicide attempt.

Father also discussed the children. He explained that he and mother identified several of the children's issues, such as A. needing glasses and M. needing tubes in his ears. In order to meet the children's needs, father said that he and mother took the children to numerous doctors in Richmond and the Tidewater area.

The foster mother testified about the children. Both of the children have special needs and learning disabilities. When M. first entered foster care, he was nonverbal. M. was five years old and did not know his colors, shapes, numbers, or ABC's. Even though she was seven years old when she entered foster care, A. also did not know her ABC's and could only count to five. The foster mother said that initially, the children did not like to bathe unless they were with each

other, and they displayed some sexually inappropriate behavior. Both children were aggressive and did not like to be touched. The school frequently called the foster mother because M. had been aggressive with another student or damaged property. M. hit and bit the foster mother. He also hit himself or banged his head on the floor. A. was "unkind" to her peers and yelled. Neither one of the children knew how to eat with silverware, so they shoved the food in their mouths. They were malnourished and refused to eat anything other than McDonald's. The children could not dress themselves. Both had trouble sleeping and had frequent nightmares. Both children wore pull-ups due to being incontinent. The children had trouble with fine motor skills and could not brush their teeth on their own.

Both children also had physical and health issues when they entered foster care. A. required surgery to correct two lazy eyes. She also required oral surgery to remove two baby teeth and had to have cavities filled. Both children had to have their tonsils and adenoids removed, and they needed tubes for their ears. Both children needed braces for their feet and legs. Both required counseling, physical therapy, speech therapy, and occupational therapy.

At the time of the circuit court hearing, the children had improved physically, socially, and academically. Both children have learning disabilities and have individualized education programs (IEP). A.'s IEP states that she was diagnosed with brain damage secondary to autism. M.'s IEP states that he was diagnosed with autism and attention deficit disorder. The foster mother homeschooled the children over the summer. At the time of the circuit court hearing, A. was reading at grade level and could write her ABC's. She could count to 100 and was learning addition, subtraction, and multiplication. M. knew his ABC's, colors, and days of the week. A. could dress herself, but needed some assistance with buttons and zippers. M. still needed help dressing himself. Both children enjoyed going to school and social activities. Both children

were calmer. The foster mother said that each child still went to approximately five appointments each week.

At the conclusion of all of the evidence and argument, the circuit court terminated father's parental rights pursuant to Code § 16.1-283(B), (C)(1), and (C)(2). This appeal followed.

ANALYSIS

Father argues that the trial court erred in terminating his parental rights to A. and M. pursuant to Code § 16.1-283(B) and (C). "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." Fauquier Cty. Dep't of Soc. Servs. v. Ridgeway, 59 Va. App. 185, 190, 717 S.E.2d 811, 814 (2011) (quoting Martin v. Pittsylvania Cty. Dep't of Soc. Servs., 3 Va. App. 15, 20, 348 S.E.2d 13, 16 (1986)). "When considering termination of parental rights, 'the paramount consideration of a trial court is the child's best interests.'" Id. (quoting Logan v. Fairfax Cty. Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 463 (1991)).

Father argues that the children were removed from his care because he had a bad reaction to medication he was prescribed. He asserts that after the medication issues were resolved, he could have resumed caring for his children. Contrary to his arguments, however, father did not remedy the conditions that led to the children being placed, and remaining, in foster care.

Code § 16.1-283(C)(2) states that a court may terminate parental rights if:

> The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

- 7 -

In this case, the children entered foster care after father drove them to Fairfax County when he had serious mental health issues that required an extended hospitalization and mother was incarcerated. The Department presented evidence about father's mental health and services offered to him. Father's mental health issues remained a concern throughout the time the children were in foster care. In addition to the hospitalization in November 2015, father was hospitalized again in February 2017 due to a suicide attempt. The Department referred father for numerous evaluations and counseling. Father refused to cooperate with the testing conducted by Dr. King, who opined that father's mental health issues prevented him from taking care of his children. Dr. King also opined that he was very likely a danger to the children.

At the time of the circuit court hearing, the children had been in foster care for almost two years. Father was not able to take care of the children because he was incarcerated. He did not have a place to live or a job upon his release. Father had not addressed his mental health issues.

"The twelve-month time limit established by Code § 16.1-283(C)(2) was designed to prevent an indeterminate state of foster care 'drift' and to encourage timeliness by the courts and social services in addressing the circumstances that resulted in the foster care placement." L.G. v. Amherst County Dep't of Soc. Servs., 41 Va. App. 51, 56, 581 S.E.2d 886, 889 (2003). "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." Tackett v. Arlington Cty. Dep't of Human Servs., 62 Va. App. 296, 322, 746 S.E.2d 509, 522 (2013) (quoting Kaywood v. Halifax Cty. Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990)).

The evidence proved that although the children have improved while in foster care, they have special needs that demand significant time and attention. They have numerous

appointments on a weekly basis. The children need consistency and stability, which father is unable to provide.

The trial court found that it was in the children's best interests to terminate father's parental rights and approve the goal of adoption. The trial court found the foster mother's testimony about the condition of the children from the time they entered foster care until the circuit court hearing to be "quite candid" and "more believable" than mother or father's testimony. "It is well established that the trier of fact ascertains a witness' credibility, determines the weight to be given to their testimony, and has discretion to accept or reject any of the witness' testimony." Layman v. Layman, 62 Va. App. 134, 137, 742 S.E.2d 890, 891 (2013) (quoting Street v. Street, 25 Va. App. 380, 387, 488 S.E.2d 665, 668 (1997) (*en banc*)).

Based on the totality of the circumstances, the trial court did not err in terminating father's parental rights pursuant to Code § 16.1-283(C)(2) and approving the goal of adoption.

The trial court also terminated father's parental rights pursuant to Code § 16.1-283(B) and (C)(1). "When a trial court's judgment is made on alternative grounds, we need only consider whether any one of the alternatives is sufficient to sustain the judgment of the trial court, and if so, we need not address the other grounds." Kilby v. Culpeper Cty. Dep't of Soc. Servs., 55 Va. App. 106, 108 n.1, 684 S.E.2d 219, 220 n.1 (2009); see also Fields v. Dinwiddie Cty. Dep't of Soc. Servs., 46 Va. App. 1, 8, 614 S.E.2d 656, 659 (2005) (the Court affirmed termination of parental rights under one subsection of Code § 16.1-283 and did not need to address termination of parental rights pursuant to another subsection). Therefore, we will not consider whether the trial court erred in terminating father's parental rights pursuant to Code § 16.1-283(B) and (C)(1).

CONCLUSION

For the foregoing reasons, the trial court's ruling is summarily affirmed.  Rule 5A:27.

<u>Affirmed.</u>