COURT OF APPEALS OF VIRGINIA


Present:   Chief Judge Felton, Judges Haley and Beales
Argued at Alexandria, Virginia


GERARDO JESUS ORTEGA

v.      Record No. 2455-09-4

FAIRFAX COUNTY DEPARTMENT OF FAMILY SERVICES

GERARDO JESUS ORTEGA

    v.      Record No. 2456-09-4

FAIRFAX COUNTY DEPARTMENT OF FAMILY SERVICES

                                                MEMORANDUM OPINION[*] BY
GERARDO JESUS ORTEGA                             JUDGE JAMES W. HALEY, JR.
                                                       JUNE 15, 2010
    v.      Record No. 2457-09-4

FAIRFAX COUNTY DEPARTMENT OF FAMILY SERVICES

GERARDO JESUS ORTEGA

    v.      Record No. 2458-09-4

FAIRFAX COUNTY DEPARTMENT OF FAMILY SERVICES


                FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
                         Robert J. Smith, Judge

        Mark Bodner for appellant.

        Deborah C. Laird, Assistant County Attorney; Anne Wren Norloff,
        Guardian *ad litem* for the minor children (David P. Bobzien,
        County Attorney; Peter D. Andreoli, Jr., Deputy County Attorney, on
        brief), for appellee.


---

        [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

## I. INTRODUCTION

Gerardo Jesus Ortega maintains the trial court erred in terminating his parental rights to two children, the court having determined he failed to timely and substantially remedy the conditions which led to or required continuation of the placement of those children in foster care, as required by Code § 16.1-283(C)(2).[1] We find the decision of the trial court supported by clear and convincing evidence and affirm the same.[2]

## II. BACKGROUND

In July 2006, the Fairfax County Department of Family Services (DFS) received a Child Protective Services referral. That referral alleged that Ar, a female child then age nine, had been sexually abused by Israel Valle, an adult man living in her home at the invitation of her father, Ortega. The child's mother was deceased. DFS met with Ortega and developed a safety plan whereby Valle left and Ortega agreed to prohibit any contact between Valle and his children.[3] Ortega also had a seven-year old son, An.[4]

In December 2006, DFS received a report Ortega had physically abused the children. Ortega denied the same. The family lived in a one-bedroom apartment. Because the children had nothing to eat but rice and beans, DFS referred the family for food assistance.

---

[1] Ortega does not maintain that Fairfax County Department of Family Services (DFS) did not offer "reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies" to remedy those conditions, as also required by Code § 16.1-283(C)(2). Nor does Ortega maintain DFS failed to seek placement of the children with relatives of the child. See Code § 16.1-283(A).

[2] DFS conceded at oral argument that Ortega had preserved his challenge to the sufficiency of the evidence. See Code § 8.01-384.

[3] Apparently, Valle was convicted upon Ar's testimony and either remains in jail pending deportation, or has been deported.

[4] We refer to the female child as Ar and her brother as An.

- 2 -

On March 20, 2007, DFS received a third referral and upon investigation learned that Valle had returned, that the sexual abuse was continuing, and that Valle threatened to kill Ar if she told anyone. It was also discovered that Valle had sexually abused An. Ortega first said that Valle was a minister in his church, but later admitted it was a falsehood. Ortega claimed Valle only stayed in his home several days a week, and he permitted Valle to return to the home, despite the specific prohibition in the safety plan, because Valle gave him money and because Ortega had "a soft heart."

On March 22, 2007, DFS obtained emergency removal orders. Marcela Dzeda, a licensed clinical social worker, was assigned to monitor Ortega's progress. On April 26, 2007, the Fairfax Juvenile and Domestic Relations District Court (J&D court) entered a finding of abuse and neglect against appellant.

On June 11, 2007, the J&D court placed the children in temporary custody of DFS (with supervised visitation by Ortega), with a foster care goal of return home. Ortega was ordered to submit to a psychological examination and an alcohol and drug evaluation and follow all recommendations generated as a result of these, as well as participate in parenting classes. Ortega was also ordered to develop a safety plan for the children.

By agreed J&D court order entered December 5, 2007, custody was retained with DFS, the foster care plan to return home again approved, and Ortega directed to comply with the June 11, 2007 order. Similar orders were entered on April 16, 2008, and July 21, 2008, each again with a permanency plan to return to home. Significantly, the July 21, 2008 order, though finding Ortega participated in therapy and visitations, also recites the following: "It further appearing to the Court that the father's living arrangements continue to be unstable and the father has not been honest with the Department about his living environment."

- 3 -

On September 16, 2008, DFS filed petitions seeking the termination of Ortega's parental rights as to each child and a permanency plan with the goal of adoption likewise for each. On March 18, 2009, the J&D court entered orders granting the petitions. At that time, the children had been in foster care for two years, since the original emergency order of March 22, 2007.

Ortega appealed, and the matter was heard on September 1-2, 2009. In addition to the testimony, the entire case file, including all the permanency plans, the voluminous letters sent to Ortega, and the DFS supporting documents, was introduced without objection and made part of the record before us.

Marcela Dzeda, a licensed clinical social worker employed by DFS, was assigned the Ortega matter, as noted above, in March 2007, and continued in that capacity until January 2009 when she went on maternity leave.

Dzeda testified that Ortega had completed an alcohol and drug evaluation, a psychological examination, and a parenting class in 2007. He refused to have a psychiatric examination or consider using any medication such an examination might recommend. He did visit the children on a weekly basis, though sometimes appearing late for appointments.

The goal of the permanency plans of June 11, 2007, December 5, 2007, April 16, 2008, and July 21, 2008, was always to return the children to their home, and DFS efforts were consistent with this goal.

But two problems continued to arise: (1) Ortega's continuous failure to provide a physical home for himself and the children and to demonstrate he had funds to provide for their necessities; and (2) Ortega's continuous failure to provide what was referred to as a safety plan; that is, a demonstration that he appreciated the psychological trauma the sexual abuse had visited upon the children, that he accepted his responsibility for not protecting them from the same, that

- 4 -

he would aid in their psychological recovery, and that he would prevent any reoccurrence of such trauma.

With respect to the former, Ortega never provided DFS, despite repeated requests for over two years, any information as to where he actually worked, such as a letter from a purported employer that he was working, giving rates and times. He claimed at various times to be working for a car painting business, for a home remodeling business, and for a landscaping business. But he refused to provide any pay-stubs, or paycheck copies, or W-2's. He did provide verbal information with respect to a rough budget, but it showed that after rent and utilities, he retained only $130 per month to pay for the children to have food, clothing, transportation, or the $300 per month he was supposed to pay DFS for child support. Indeed, DFS filed a petition which relieved him of this latter obligation for a period of six months so as to help Ortega. Ortega was not eligible for further financial assistance because he was, and remains, an undocumented alien. On cross-examination, Dzeda testified without objection that one of Ortega's pastors stated: "that that man has never worked, and instead, he goes around asking for money from different churches."

With respect to housing, Ortega often simply would not tell DFS where he was living, or if he did, he would refuse them a visit to inspect the premises. In March 2008, he permitted them to visit a two-bedroom apartment, which would have been appropriate housing for the children. Yet by June 2008, the power had been turned off. In October 2008, Ortega advised he was living with a friend in a rented room, but would not permit a visit, insisting he would soon get an appropriate apartment.

Nicole Cox, a foster care worker who followed the case from January 2009 to May 2009, when Dzeda was on maternity leave, was given an address where Ortega lived and conducted an unannounced visit on March 17, 2009. He was renting a single 10' by 12' room, which he

shared with another man, in a home occupied by ten people. He slept on a pallet made of blankets on the floor, and his clothes were piled on the floor beside the blankets.

The housing situation is best demonstrated by the following exchange when Ortega testified in the circuit court on September 2, 2009:

The second question asked on direct:

> Q. And what's your address?
>
> A. I don't have it in my mind right now. Since it's new where I'm at, I don't remember it.

On cross-examination:

> Q. Mr. Ortega, why have you not let Ms. Dzeda see where you're living?
>
> A. Because I've been working . . . .
>
> Q. And have you been at the place where you're living for a long time?
> A. I've been there a long time . . . .
>
> Q. So if you've been there for a long time, why don't you know the address?
>
> A. Well, it's confusing, when the streets are there; the numbers, and such . . . .
>
> Q. And do you have an apartment?
>
> A. At this moment, if I had my children, I would get an apartment, if I could have three days, or a week, in order to do that.

By the court:

> Q. [A]re you renting a room in a house?
>
> A. Yes, I'm renting a room in a house.

Concerning the second problem noted above, that is, the necessity to provide a safety plan for the children, Dzeda testified:

> I was . . . looking to see if he would accept some sort of
> responsibility for the abuse that occurred, and what steps he would
> really take, in order to make sure that no abuse were to happen
> again in the future, and I didn't really get any of that . . . . Because
> in terms of a safety plan, he wasn't taking any responsibility of his
> role in the abuse that took place; he didn't appear to understand the
> impact that this severe sexual abuse happened on his kids, and it
> was a pretty big deal. And I never got that sense from him, that he
> really got it . . . . [The permanency plan was finally changed to
> adoption because in part] I think it was his inability to demonstrate
> parenting abilities to keep these kids safe.

LaTeeka Tutwiler, a social worker with Child Protective Services, had been involved in the 2006 investigation, noted above, which received reports Ortega had been beating the children, and with the 2007 investigation of sexual abuse which led to their removal. With respect to safety, Tutwiler testified that Ortega "stated that several men had sexually abused his daughter" (not including Valle). Ortega told Tutwiler that he only knew the first names of these men and that they had returned to Mexico. As the record discloses, Ortega had never mentioned this abuse before and had never reported it to the police.

David Benjamin, a licensed social worker whose primary area of work is the psycho-social assessment of children between seven and nineteen years of age and who has aided over a thousand children, qualified as an expert. He had seen An weekly from August 2007 until the hearing in September 2009. An is "anxious" and has a hard time discussing what had happened to him. Ortega attended some of the sessions with An and Benjamin. Benjamin testified that An "doesn't seem to really have a tremendous attachment for his father . . . . I never got a sense that there was like any great warmth between the two of them." He continued: "Q. And how successful . . . were you in being able to discuss that [the sexual abuse] in family therapy with Mr. Ortega? A. Actually, not successful at all."

Benjamin related that Ortega would not discuss where he worked or where he lived and gave inconsistent stories about his relationship with Valle, including how Valle came to live in, and then return to, his home.  He further testified:

> Q.  Now, after working with [An] and Mr. Ortega for two years, what is your opinion, within a reasonable degree of certainty in the field of social work, as to Mr. Ortega's ability to care for [An]?
>
> A.  I don't have any sense at all of that.  I mean, he never -- well, he never seemed concerned about actually how the kids are doing; he never asked me.
>
> He never showed concern about his son's sexual abuse history, and how that might have affected him.  He never actually asked how he was doing emotionally . . . never showed or expressed any interest or concern, as his therapist, about -- simply, like, how's he doing.

Benjamin concluded that An is presently "doing good enough in school, probably close to his ability.  He gets along with his foster family; he has some friends.  He's doing okay now." An is now eleven years old.

Pamela Frank, a licensed professional counselor, supervises nine other clinicians and has her own caseload.  She qualified as an expert.  Ar is one of her patients, who she has seen on a weekly basis since August 2007.  Ar suffers from sleep disturbances, flashbacks to her sexual abuse, a fear of basements or dark places, and "hyper-arousal," that is, "hyper-vigilance" to sounds, etc.  She testified:

> Q.  So how far . . . did you get toward developing any kind of concrete safety plan?
>
> A.  Well, it was difficult to create a safety plan, because we weren't able to get phone numbers [from Ortega] and . . . creating a safety plan is important.  But you have to have an address, you have to have a place where we can create a safety plan around. Mr. Ortega was never forthcoming with that information, so we never were able to sort of set down and create what would be a safety plan.

Frank continued:

> Q. [W]hat is your opinion, to within a reasonable degree of certainty . . . as to Mr. Ortega's ability to protect [Ar] if she is returned to his care?
>
> A. I have doubts that he would be able to do that, because he doesn't seem to recognize . . . . You have to be aware of situations to be able to change them, and I have not seen that kind of awareness with Mr. Ortega.

Addressing the second problem, that is, the development of a safety plan, Ortega testified that "I have concrete plans, and sure plans . . . . I have a plan that's well-defined, about what I'm going to do with my children." But above and beyond general plans such as getting an apartment sometime in the future, hiring a babysitter, employing professional therapists, and informing the children of emergency telephone numbers, Ortega could not state the details of his plan.

In opening statement, Anne Norloff, the guardian *ad litem* for the children stated: "[Ortega] has had an amazing number of services, and is still not able to achieve a reasonable living situation for the children." In closing statement, Ms. Norloff supported the termination of parental rights and concluded: "And Mr. Ortega has not remedied the conditions that brought the children into care."

## III.  STANDARD OF REVIEW

We presume in our review of a decision to terminate parental rights that the circuit court "'thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based upon the child's best interests.'" Fields v. Dinwiddie County Dep't of Soc. Servs., 46 Va. App. 1, 7, 614 S.E.2d 656, 659 (2005) (quoting Farley v. Farley, 9 Va. App. 326, 329, 387 S.E.2d 794, 796 (1990)). "The trial court's judgment, when based on evidence heard *ore tenus*, will not be disturbed on appeal unless plainly wrong or without evidence to support it." Id. (internal quotation marks omitted); see also Gray v. Gray, 228 Va. 696, 699, 324 S.E.2d 677, 679 (1985). We view that evidence in the light most favorable to the party who prevailed in

- 9 -

the circuit court and grant to that party all reasonable inferences fairly deducible from that evidence. Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 262, 616 S.E.2d 765, 767 (2005).

Because "the rights of parents may not be lightly severed," M.G. v. Albermarle County Dep't of Soc. Servs., 41 Va. App. 170, 187, 583 S.E.2d 761, 769 (2003) (internal quotation marks omitted), evidence justifying termination must be clear and convincing, Lowe v. Dep't of Pub. Welfare, 231 Va. 277, 281, 343 S.E.2d 70, 72 (1986). Nonetheless, we cannot "substitute our judgment" for the circuit court's, even upon such a weighty issue as termination; rather our review of the record is limited to a determination as whether or not the evidence adduced supports, by the clear and convincing standard, the decision of the trial court. Ward v. Commonwealth, 13 Va. App. 144, 148, 408 S.E.2d 921, 923 (1991). Finally, we are reminded that, at its core, the "child's best interests" remain the "paramount consideration" of the court. Akers v. Fauquier County Dep't of Soc. Servs., 44 Va. App. 247, 262, 604 S.E.2d 737, 744 (2004). "And the best interest of the child must be the primary concern of the court." Stanley v. Fairfax County Dep't of Soc. Servs., 242 Va. 60, 63, 405 S.E.2d 621, 623 (1991).

## IV. ANALYSIS

In this case, DFS petitioned to terminate pursuant to Code § 16.1-283(C)(2). That statute has conjunctive requirements. The court must conclude, upon clear and convincing evidence, that termination is in the best interest of the child and that "[t]he parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed twelve months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement." Code § 16.1-283(C)(2); see also Toms, 46 Va. App. at 271, 616 S.E.2d at 772; L.G. v. Amherst County Dep't of Soc. Servs., 41 Va. App. 51, 56-57, 581 S.E.2d 886, 889 (2003).

- 10 -

The twelve-month time period established by Code § 16.1-283(C)(2) is a "reasonably presumptive time frame . . . for parents to receive rehabilitative services to enable them to correct the conditions that led to foster care placement." L.G., 41 Va. App. at 57, 581 S.E.2d at 889. Yet this twelve months "does not, however, temporally restrict the trial court's consideration to events that occurred between the parent and the child only during that discrete twelve-month time period to the exclusion of what may have occurred before and after those dates." Id. To construe the twelve-month period as a limit "would deny the fact finder the opportunity to evaluate the present best interests of the child." Roanoke City Dep't of Soc. Serv. v. Heide, 35 Va. App. 328, 337, 544 S.E.2d 890, 894 (2001).

Ar and An entered foster care by order of March 22, 2007. Ortega's parental rights were terminated by order entered October 21, 2009. That is an interval of thirty-one months. DFS filed and the court approved permanency plans with the goal of return to "home." Here, that home requires at a minimum a realistically permanent physical space to house the children and a demonstration of financial resources to provide not just the housing, but adequate means to provide food, clothing, and supervision for these children. A home, in these circumstances, further requires one in which the surviving parent personally recognizes the psychological devastation imposed on these children by their prior sexual abuse, the effects of which devastation remained in existence at the time of the hearing in circuit court. A home also requires a concomitant acknowledgement by this parent of his prior failure to protect his children from sexual abuse. In short, here, a home requires a safety plan. Ortega does appear to love these children. But love for a child, alone, does not constitute a home for a child; nor does love for a child constitute a sole reason not to terminate parental relations.

Two persistent problems led DFS to change the permanency plan to one of adoption in September 2008. These problems were discussed in detail above—a lack of a physical home and

- 11 -

the lack of a safety plan. As of the dates of the hearing in circuit court, September 1-2, 2009, Ortega had addressed neither. He had no physical home for the children; he had no safety plan.[5] And he was granted twice the length of time allotted by statute to provide the same.

Ortega "had not progressed to a point where [he] was capable of functioning as an independent parent." Jenkins v. Winchester Dep't of Soc. Servs., 12 Va. App. 1178, 1183, 409 S.E.2d 16, 19 (1991). Ortega provided no plans for the care of these children. Ortega's "'past actions . . . over a meaningful period serve as good indicators of what the future may be expected to hold.'" Wingfield v. Urquhart, 25 Va. App. 688, 695-96, 492 S.E.2d 464, 467 (1997) (quoting Linkous v. Kingery, 10 Va. App. 45, 56, 390 S.E.2d 188, 194 (1990)).

The decision of the circuit court is supported by clear and convincing evidence and is, accordingly, affirmed.

                                                                                Affirmed.

---

[5] On brief, Ortega argues evidence concerning his lack of verifiable employment and his unstable housing do not relate to "the conditions which led to or required continuation of the child's foster care placement" under Code § 16.1-283(C)(2). Ortega argues such conditions were remedied by the lack of further contact with Valle. We disagree. Ortega's inability to maintain stable housing and finances concern the likelihood of future sexual abuse.