COURT OF APPEALS OF VIRGINIA


Present:   Chief Judge Felton, Judges Kelsey and McClanahan
Argued at Salem, Virginia


HEATHER RENEE IRVINE PRICE WILLIAMS
                                                    MEMORANDUM OPINION[*] BY
v.        Record No. 0698-10-3              JUDGE ELIZABETH A. McCLANAHAN
                                                        FEBRUARY 1, 2011
DEPARTMENT OF SOCIAL SERVICES
  FOR THE COUNTY OF CAMPBELL


                FROM THE CIRCUIT COURT OF CAMPBELL COUNTY
                                John T. Cook, Judge

          F.E. "Tripp" Isenhour, III (Caskie & Frost, on brief), for appellant.

          David W. Shreve, Campbell County Attorney, for appellee.

          Grady W. Donaldson, Jr. (Schenkel & Donaldson, P.C., on brief),
          Guardian *ad litem* for the minor child.


        Heather Williams (Williams) appeals the circuit court's decision terminating her parental

rights to her daughter, H.W., pursuant to Code § 16.1-283(B) and 16.1-283(C)(2).  Williams

argues:  (i) the circuit court erred in admitting into evidence two certain internet generated

documents, because those documents, allegedly containing her comments, were not properly

authenticated; and (ii) there was insufficient evidence to support the termination decision.  For

the following reasons, we affirm the judgment of the circuit court.

                                    I.  BACKGROUND

        "We view the evidence in the 'light most favorable' to the prevailing party in the circuit

court and grant to that party the benefit of 'all reasonable inferences fairly deducible therefrom.'"

Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 262, 616 S.E.2d 765, 767 (2005)

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

(quoting Logan v. Fairfax County Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 463 (1991)).

On November 28, 2006, the Department of Social Services for Campbell County (DSS) received a complaint at approximately 9:00 a.m. that a young child—later identified as H.W., who was 22 months old at the time—was being left alone at home. Tecora Johnson, then a DSS child protective services investigator, testified that according to the report "the mother takes off early in the morning and sometimes comes back in one hour, sometimes longer." On this particular morning, "[t]he neighbors were hearing the child crying inside the house."

Johnson, along with Campbell County Deputy Sheriff Saunders, investigated the complaint. After arriving at the home at approximately 10:00 a.m. and knocking on all the doors with no response, Johnson and Saunders observed a woman, later identified as Williams, H.W.'s mother, walking toward the house from across the street. When Johnson told Williams why she and Deputy Saunders were there, Williams stated that, if H.W. had been left alone, it was for only a few minutes because the child's father, Joshua Williams (Joshua), "must have just left" before they arrived.

Upon entering the home, Johnson was confronted with an "overwhelming" odor of cat urine and feces, and saw a cat litter box "overflowing" with feces. Johnson then discovered that H.W. was alone in a bedroom next to the dining room, that the bedroom door was blocked only by a small, old, wooden baby gate, and that a dog—a pit bull—was in the dining room chained to a partition pole, which appeared to be loose as a result of the dog pulling on it. Because of these conditions, Johnson became concerned for H.W.'s safety. When Johnson confronted Williams about these conditions, Williams just repeated that the child's father was there before she left and that she did not leave the child alone. Johnson asked Williams to meet her at DSS's office later that morning, along with Joshua.

Before Williams and Joshua arrived at the office, Johnson learned that Joshua had been at work with his boss since early that morning. Johnson also obtained information indicating Williams and Joshua had a history of domestic violence. During her interview with Williams, Johnson confronted Williams about Joshua's location that morning, at which point Williams said she could not remember, and added that there were a "lot of things" she could not remember. Williams attributed her inability to remember to the fact that she was unable to regularly take her prescribed medication, Zoloft, because she could not afford it. She also stated that she was bipolar and needed counseling. During the interview with Joshua, Johnson learned that Williams had actually driven Joshua to work that morning. At the end of the meeting, Johnson had the couple sign a safety plan requiring, among other things, that their home be cleaned and that H.W. be under constant supervision. The plan also recommended that Williams follow through with mental health treatment. Johnson further advised Williams and Joshua that DSS would seek a protective order to insure compliance with the safety plan and continue to assess their circumstances. Johnson completed her investigation, and an *ex parte* preliminary protective order was entered on November 30, 2006.

A hearing on the preliminary protective order was held on December 6, 2006, at which time the Campbell County Juvenile and Domestic Relations District Court (J&DR court) concluded it was in H.W.'s best interest to remove her from the home due to, *inter alia*, Williams' mental health issues and recent incidents of domestic violence between her and Joshua. The J&DR court entered an order to that effect, and DSS took custody of H.W. The court also ordered Williams to submit to a psychological evaluation.

When DSS took custody of H.W., the child was engaging in self-destructive behavior, which included "banging" her head against the floor. Deborah Maxey, a licensed family therapist and board certified traumatologist, opined that the genesis for this behavior was stress

the child was experiencing due to "some sort of disruption in her life that was going on between her mother and father."

H.W. was first placed in a non-relative foster care home. Shelia Vernoy, H.W.'s paternal aunt, was subsequently approved for foster care, and H.W. was placed with her in December 2006. This placement lasted for only one week, however, due to conflicts in Vernoy's work schedule. H.W. was then returned to her previous foster care family.

On January 5, 2007, DSS filed its initial foster care service plan with the J&DR court, which the court approved by order dated February 6, 2007. The program goal under the plan was to return H.W. to her parents, with a target date of December 2007. The "initial service need for the family" in terms of working towards that goal was "treatment for [Williams'] mental health, the need for proper supervision of [H.W.], safe and sanitary housing, and no instances of domestic violence." The plan required that Williams "[c]omplete [a] psychological evaluation"; "[c]omplete all recommendations made in the psychological evaluation"; "[c]ooperate with necessary services and goals deemed necessary by services providers and DSS"; "[p]articipate in parenting classes"; "[m]aintain consistent contact with services providers and DSS staff"; "[m]aintain honest communication with services providers and DSS staff"; "[m]aintain consistent and appropriate visitation with [H.W.]"; and "[r]efrain from acts of domestic violence."

DSS noted in this initial foster care service plan that, pursuant to the J&DR court's December 6, 2006 order, DSS had referred Williams to Piedmont Psychiatric Center (PPC) for a psychiatric evaluation. DSS further noted that, due to Williams' immediate "mental health needs," DSS had also referred her to the Central Virginia Community Services Board and Johnson Health Services for counseling and medication management.

Doctor Stacey Felmlee, a licensed clinical psychologist at PPC, conducted Williams' psychological evaluation and issued her report on January 19, 2007. Felmlee diagnosed Williams as suffering from "Adjustment Disorder With Mixed Anxiety and Depressed Mood" and "Depressive Disorder Not Otherwise Specified (by history)," and recommended that Williams pursue mental health treatment for her depression and anxiety. Felmlee also recommended in her report that Williams and Joshua attend couples' counseling "with a focus on effective communication and nonviolent conflict-resolution," given that their relationship was "at risk for continued instability, volatility, and domestic violence, which is not a healthy or safe environment in which to raise a child," that Williams "attend and actively participate in anger management classes" in an effort to help her "resolve conflict in productive and nonviolent ways," and that Williams "attend and actively participate in both child development and parenting classes" due to her inadequate knowledge regarding "child development and age-appropriate parenting techniques."

In making these recommendations, Felmlee noted in her report, among other things, that Williams "acknowledged passive suicidal ideation" and had a "history of superficial cutting," that Williams "tended to focus on her needs and feelings rather than those of her daughter," and that Williams had "difficulty taking responsibility for her behavior resulting in her daughter's removal and blamed DSS and her neighbors for her current situation." Felmlee also noted that Williams' "childhood history, poor social judgment, emotional needs, volatile relationship with her partner, and lack of knowledge about child development and age-appropriate parenting techniques place[d] her at risk for developing poor parent-child boundaries, exposing her daughter to domestic violence, and for neglectful behavior, even if unintentional."

DSS filed a foster care service plan review with the J&DR court on July 3, 2007, in which the program goal was still to return H.W. to her parents with a target date of December

2007. At that time, Williams and Joshua had married, and it was reported that they were cooperating with DSS relative to their service plan requirements; but they were struggling with their finances and would need to be "working with the home based provider regarding budgeting skills."

By the time DSS filed its subsequent foster care service plan review on November 19, 2007, however, the couple had separated. DSS reported that Joshua moved out of the home in September and moved in with a relative; Williams was later evicted, and had moved in with a friend. It was also reported that, "[w]ith their marital status in question, they were unable to focus on regaining custody of their child," and "fell back into old lifestyle patterns." At the December 19, 2007 permanency planning hearing that followed, DSS requested and received from the J&DR court a three-month extension in order to continue working with the parents towards the goal of returning H.W. to them.

On March 3, 2008, DSS filed its next foster care service plan review with the J&DR court, along with a new foster care service plan, in which DSS proposed changing the program goal to adoption. In making this proposal, DSS outlined Williams' and Joshua's continuing "struggle[s]" and difficult[ies]." As to Williams, DSS reported that she was struggling with achieving significant gains from the support services that were being offered to her. According to DSS, "[s]he continues to report she is a good parent and blames [H.W.'s] removal on [DSS]. She has not reached the point of realizing she needs to strengthen her abilities. She continues to be more focused on her personal relationships and self-interest." DSS further reported that, since the previous hearing, Williams was having difficulties with her personal relationships, i.e., her boyfriends, which involved domestic violence. DSS also reported that Williams was struggling with keeping a job, having left two jobs and started on a third one between November 2007 and January 2008, and that she was, in turn, struggling with budgeting her personal finances, despite

the assistance she was receiving from DSS for housing, food, transportation, and electricity. As to housing, DSS reported that it had assisted her in obtaining government subsidized ("Section 8") housing in December, at a cost to her of sixty-eight dollars a month in rent, but she had not yet paid her rent for December, January or February. DSS concluded: "Due to the fact that this is the second permanency planning hearing and neither parent is ready to have the child placed with them, the goal of return home needs to be changed." In other words, according to DSS, "[a]fter 14 months in foster care [H.W.] needs permanency and neither parent can offer that at this time." Finally, DSS reported that H.W. had been moved in January 2008 to "a two-parent therapeutic foster home," that these foster parents had agreed to adopt H.W. if all relative placements were exhausted, and that H.W. was "adjusting well" to this placement.

The J&DR court rejected DSS's proposal to change the program goal to adoption because Vernoy, H.W.'s paternal aunt, filed a petition for custody of H.W. and established that her work schedule no longer conflicted with her ability to care for H.W. H.W. was placed with Vernoy on April 20, 2008. But as DSS reported in its foster care service plan review filed with the J&DR court on May 23, 2008, H.W.'s behavior soon deteriorated while in Vernoy's custody and the placement ended on May 13, 2008 at Vernoy's request. H.W. was then returned to her previous therapeutic foster care parents, who still wished to adopt her.

When filing the foster care service plan review on May 23, 2008, DSS also filed a new foster care service plan, in which DSS again proposed changing the program goal to adoption. As to why adoption was in H.W.'s best interest, DSS reported that, by the time of this review, H.W. had been in foster care for 17 months, that she "needs permanency," and that "neither parent is in a position to have the child placed in their home." In regards to Williams, DSS reported that she was still having the same kinds of "struggle[s]" as before in terms of her utilization of DSS's support services to improve her parental status. The list of support services

offered to Williams since December 2006, as documented in this latest DSS foster care service plan review, included: a psychological evaluation; anger management classes through the Center for Independent Living; individual counseling through Johnson Health Center; couples counseling at Couples and Kids; home based services through Anderson Mediation Services and Comprehensive Family Services; family counseling provided by Comprehensive Family Services; instruction on parenting skills and budgeting skills; assistance with housing; coordination of weekly visitation; Medicaid; coordination of medical and dental needs; and assistance with electric bills and transportation.

At the June 10, 2008 hearing on these latest DSS filings, the J&DR court approved DSS's proposed new foster care service plan and changed the goal for H.W. to adoption.

DSS then filed a petition in the J&DR court to terminate Williams' and Joshua's residual parental rights to H.W. in order to proceed with the goal of adoption. After a number of delays in scheduling the termination hearing, on August 4, 2009, the J&DR court heard the case and entered an order terminating the parental rights of both parents. Williams, along with Joshua, appealed the J&DR court's decision to the circuit court.

The circuit court heard evidence on DSS's termination petition on November 23, 2009, January 19, 2010, and February 8, 2010. DSS presented evidence of the above-described history, beginning with the events leading to its decision to remove H.W. from her parents to its decision to change H.W.'s foster care service plan goal from "return to own home" to adoption, and to then seek parental termination. As to Williams, DSS further detailed her conduct over the course of the previous three years evidencing her lack of significant improvement in the areas of parenting and budgeting skills, mental health, and personal relationships, relative to recurring incidents of domestic violence, despite the numerous support services she received from DSS and other government agencies. Regarding Williams' ongoing mental health issues, DSS

established, among other things, that Williams slit her wrist, assaulted two of her boyfriends, threatened to harm Joshua and his girlfriend, Priscilla G., threatened to kill DSS workers, and threatened to kill herself. In addition, DSS presented evidence detailing H.W.'s progress while in foster care. The circuit court also heard Williams' testimony in opposition to DSS's petition.

The circuit court found that DSS established the grounds for terminating Williams' parental rights to H.W. by clear and convincing evidence, pursuant to Code § 16.1-283(B) and 16.1-283(C)(2), and entered a final order to that effect on March 2, 2010.

Williams' appeal to this Court followed.[1]

## II. ANALYSIS

### A. Admissibility of DSS's Exhibits 11 and 12

Williams argues the circuit court erred in admitting into evidence two internet generated documents, DSS's exhibits 11 and 12, over her objection to their admission on the ground that the documents were not properly authenticated. The documents, according to DSS's witness, Judi Lariviere, were copies of two postings by Williams on her "MySpace" page indicating some relationship between her and "Mikey" in June 2008. Williams contends the documents were inadmissible because Lariviere could not establish that Williams actually authored the postings. Williams further contends that, without admission of those documents, the circuit court's termination decision "quite possibly [could] have been different," rendering their admission reversible error. Assuming without deciding that the circuit court erred in admitting the two documents, we conclude that any such error was harmless.

As dictated by statute in Virginia, non-constitutional error is harmless "[w]hen it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on

---

[1] The circuit court also terminated Joshua's parental rights to H.W., which decision Joshua has challenged in a separate appeal to this Court.

the merits and substantial justice has been reached."  Code § 8.01-678.  Thus, as we recently

reiterated:

> "If, when all is said and done, [it is clear] that the error did not influence the [fact finder], or had but slight effect, . . . the judgment should stand . . . .  But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected . . . . If so, or if one is left in grave doubt, the [judgment] cannot stand."

Andrews v. Creacey, 56 Va. App. 606, 625, 696 S.E.2d 218, 227 (2010) (quoting Clay v.

Commonwealth, 262 Va. 253, 260, 546 S.E.2d 728, 731-32 (2001)); see also Schwartz v.

Schwartz, 46 Va. App. 145, 159, 616 S.E.2d 59, 66 (2005).

Here, the fact that Williams was having a relationship with "Mikey" during the period of

time at issue, as indicated in the documents identified as DSS's exhibits 11 and 12, is undisputed.

Williams admitted to Lariviere that "Mikey" was one of her boyfriends at that time.  The

information in those documents was merely cumulative evidence of that fact.  Thus, in light of

the cumulative nature of those documents, as well as the evidence in the record supporting the

circuit court's termination decision, as addressed below, it is clear that those documents had no

more than "'slight effect,'" if any, on the court in rendering its decision.  Andrews, 56 Va. App.

at 625, 696 S.E.2d at 227 (quoting Clay, 262 Va. at 260, 546 S.E.2d at 731).

## B.  Evidentiary Sufficiency

Williams challenges the evidentiary sufficiency of the circuit court's decision to

terminate her parental rights to H.W. under both Code § 16.1-283(B) and Code § 16.1-283(C)(2).

Because we conclude the evidence was sufficient to support the circuit court's termination

decision under Code § 16.1-283(C)(2), we need not address Williams' argument regarding

whether the court erred in its alternative ruling to terminate under subsection B of the statute.

See Fields v. Dinwiddie County Dep't of Soc. Servs., 46 Va. App. 1, 7, 614 S.E.2d 656, 659

- 10 -

(2005) (termination of parental rights upheld under one subsection of Code § 16.1-283 negates need to consider termination under alternative subsection).

Upon our review of a decision to terminate parental rights, we presume the circuit court "'thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" Toms, 46 Va. App. at 265-66, 616 S.E.2d at 769 (quoting Fields, 46 Va. App. at 7, 614 S.E.2d at 659). "'The trial court's judgment, when based on evidence heard *ore tenus*, will not be disturbed on appeal unless plainly wrong or without evidence to support it.'" Id. at 266, 616 S.E.2d at 769 (quoting Fields, 46 Va. App. at 7, 614 S.E.2d at 659 (other citation and internal quotation marks omitted)). "In its capacity as factfinder, therefore, the circuit court retains 'broad discretion in making the decisions necessary to guard and to foster a child's best interests.'" Id. (quoting Farley v. Farley, 9 Va. App. 326, 328, 387 S.E.2d 794, 795 (1990)).

Code § 16.1-283(C)(2) provides for the termination of parental rights if the trial court finds, based upon clear and convincing evidence, that it is in the best interests of the child, and that

> [t]he parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed twelve months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

Decisions to terminate parental rights under Code § 16.1-283(C)

> hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes. Considerably more "retrospective in nature [than subsection B of the statute]," subsection C requires the court to determine whether the parent has been unwilling or unable to remedy the problems during the period in which he has been offered rehabilitation services.

- 11 -

Toms, 46 Va. App. at 271, 616 S.E.2d at 772 (quoting City of Newport News Dep't of Soc. Servs. v. Winslow, 40 Va. App. 556, 562-63, 580 S.E.2d 463, 466 (2003)).

Pointing to the twelve-month time limit set forth in subsection (C)(2) of the statute, Williams argues there was insufficient evidence to support the circuit court's parental termination decision because: (i) the court was required to look "only at [this] one-year period" in assessing the evidence and making its decision; (ii) she substantially satisfied the requirements of the foster care service plan within the one-year period immediately following H.W.'s removal; (iii) the fact that DSS did not seek to terminate her parental rights "at the one-year mark," but instead continued to provide support services to her, should be viewed "as a tacit admission that [she] substantially complied during the relevant time period"; and DSS did not otherwise prove that termination of her parental rights was in H.W.'s best interests, as required under subsection (C)(2). Williams' arguments are without merit.

The twelve-month time limit in subsection (C)(2) was "'designed to prevent an indeterminate state of foster care "drift" and to encourage timeliness by the courts and social services in addressing the circumstances that resulted in [or required the continuation of] the foster care placement.'" Akers v. Fauquier County Dep't of Soc. Servs., 44 Va. App. 247, 256, 604 S.E.2d 737, 741 (2004) (quoting L.G. v. Amherst County Dep't of Soc. Servs., 41 Va. App. 51, 56, 581 S.E.2d 886, 889 (2003)). Thus, if the various service providers have made reasonable efforts to assist the parent in substantially remedying those circumstances and the parent has failed to do so within twelve months, "'the court may act [at that time] to prevent the child from lingering in foster care'" according to what is in the child's best interests. Id. (quoting L.G., 41 Va. App. at 57, 581 S.E.2d at 889); see Kaywood v. Halifax County Dep't of Social Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990) ("It is clearly not in the best

- 12 -

interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his responsibilities.").

This does not mean, however, that the court is prevented from considering evidence regarding the progress, or lack thereof, of the parent or the child beyond the twelve-month period set forth in subsection (C)(2). As we held in L.G., this twelve-month period must be considered in conjunction with the statutory requirement that termination is in the best interests of the child. L.G., 41 Va. App. at 56-59, 581 S.E.2d at 889-90. The best-interests-of-the-child inquiry dictates that the time limit in subsection (C)(2) cannot "temporally restrict" the trial court's consideration of what occurred with the parent and child "only during that discrete twelve-month time period to the exclusion of what may have occurred before and after those dates." Id. at 57, 581 S.E.2d at 889. "Such a construction of the statute 'would deny the fact finder the opportunity to evaluate the *present* best interests of the child.'" Id. (quoting Roanoke City Dep't of Soc. Servs. v. Heide, 35 Va. App. 328, 337, 544 S.E.2d 890, 894 (2001) (emphasis in L.G.). Therefore, in L.G., we reversed the trial court in terminating the mother's parental rights because the trial court refused to consider evidence that the mother had, in fact, made substantial progress in addressing problems leading to her child's placement in foster care after expiration of the twelve-month time period under subsection (C)(2). Id. at 57-59, 581 S.E.2d at 890. See Peter N. Swisher, Lawrence D. Diehl, and James R. Cottrell, Family Law: Theory, Practice, and Forms § 14:3, at 962 n.26 (2009) (analyzing L.G.).

In this case, the circuit court was thus entitled under Code § 16.1-283(C)(2) to consider DSS's evidence indicating that Williams' problems leading to H.W.'s placement in foster care extended well beyond December 2007 (the end of the initial twelve-month period), that those problems required continuation of H.W.'s foster care placement, and that Williams, without good cause, was unwilling or unable to substantially remedy those problems either before or after

December 2007. Likewise, the circuit court was entitled to consider DSS's evidence concerning H.W.'s progress throughout the child's placement in foster care.

Based on DSS's evidence, there was ample support for the circuit court's decision to terminate Williams' residual parental rights, pursuant to subsection (C)(2) of the statute. As discussed above, DSS's evidence showed that H.W. was removed from Williams and the child's father due to DSS's valid concerns over H.W.'s lack of proper parental supervision, the child's exposure to domestic violence, and Williams' mental health issues. Then following H.W.'s removal, DSS and other governmental agencies made reasonable and appropriate efforts to assist Williams with what DSS confirmed or otherwise discovered to be Williams' lack of parenting and budgeting skills, mental instability, including deficits with anger management, and personal relationships characterized by domestic violence.

When Williams failed to substantially remedy those problems by the end of the initial twelve-month period, DSS sought, and the J&DR court granted to Williams, an extension of three months under the foster care service plan in order to give her an additional opportunity to address her problems; during that time she continued to receive assistance from the various agencies. Despite the additional time and assistance, however, Williams, without good cause, still failed to substantially remedy the problems. Nor did she, in fact, do so over the course of the next year and a half.

As DSS showed, Williams' problems only worsened during the time leading up to the termination hearing in circuit court in late 2009 and early 2010. DSS's evidence indicated that Williams had not progressed in her parenting and budgeting skills. In fact, Williams represented that she needed no assistance with parenting skills, as she considered herself an excellent parent. When with H.W. during weekly visits, Williams was often focused on her own needs, and had minimal interaction with her daughter. DSS further showed that, due to a lack of budgeting,

Williams often failed to have funds for her basic household expenses, and was evicted from two different homes during the time in question for failure to pay her rent. Sometimes she did not even have food in her home for her daughter during visitation. DSS also presented evidence indicating that Williams continued to struggle with her mental health issues, including slitting her wrist, twice overdosing on prescription medication, attacking and threatening to attack others, and threatening to kill herself and others. She was diagnosed as suffering from anxiety, depression, and bipolar disorder, and was sporadic in attending mental health counseling made available to her. DSS further showed that Williams continued to be in and out of personal relationships characterized by repeated incidents of serious domestic violence. The evidence indicated that she was both the victim of such violence at the hands of her boyfriends and that she was at times inflicting physical violence upon them. Williams was incarcerated and awaiting trial for one such incident at the time of the termination hearing in circuit court.

The trial court heard Williams' testimony in conflict with DSS's witnesses and resolved the conflict in favor of DSS. "It is well established that the trier of fact ascertains the witness' credibility, determines the weight to be given to their testimony, and has the discretion to accept or reject any of the witness' testimony." Street v. Street, 25 Va. App. 380, 387, 488 S.E.2d 665, 668 (1997) (*en banc*) (citing Bridgeman v. Commonwealth, 3 Va. App. 523, 528, 351 S.E.2d 598, 601 (1986)).

In light of this record, covering over three years of evidence, we cannot say the circuit court's decision to terminate Williams' residual parental rights under Code § 16.1-283(C)(2) was plainly wrong or without evidence to support it.

## III.  CONCLUSION

Concluding that the challenged evidentiary ruling was not reversible error and that sufficient evidence supports the circuit court's factual findings, we affirm the circuit court's decision to terminate Williams' residual parental rights under Code § 16.1-283(C)(2).

Affirmed.
