COURT OF APPEALS OF VIRGINIA

Present:   Judges AtLee, Fulton and Ortiz
Argued by videoconference


TAMMY LYNN GRAHAM

                                                 MEMORANDUM OPINION* BY
v.        Record No. 0559-21-3                   JUDGE RICHARD Y. ATLEE, JR.
                                                 FEBRUARY 1, 2022

BEDFORD COUNTY DEPARTMENT
  OF SOCIAL SERVICES


            FROM THE CIRCUIT COURT OF BEDFORD COUNTY
                        James W. Updike, Jr., Judge

        Wilson C. Pasley (Wilson C. Pasley, PLC, on brief), for appellant.

        Brandon K. Butler, Senior Assistant County Attorney (Cary Powell
        Moseley, Guardian *ad litem* for the minor children; Cary Powell
        Moseley, PLLC, on brief), for appellee.


        Tammy Lynn Graham appeals the orders terminating her parental rights to her two

children under Code § 16.1-283(C).  She assigns three errors on appeal.  First, she argues that the

circuit court erred by terminating her parental rights to both children under Code

§ 16.1-283(C)(2) because Bedford County Department of Social Services ("DSS") filed the

petitions for termination of parental rights before the children had been in foster care for one

year.  Second, she argues the circuit court erred by terminating her parental rights with respect to

L.C. under Code § 16.1-283(C)(1) because the evidence showed she maintained contact with

L.C. after he went into foster care.  Finally, she argues that termination is not in the best interests

of the children because "it was likely that each of the conditions that had caused the children to

---

        * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

go into foster care could be remedied." For the following reasons, we disagree and affirm the decision of the circuit court.

## I. BACKGROUND [1]

Graham and David Caldwell are the biological parents of two children, J.C. and L.C. In October 2018, DSS received a report that there was both domestic violence and substance abuse occurring in the home.[2] After investigation, DSS was able to substantiate both allegations. Caldwell admitted to using methamphetamine, and Graham acknowledged that domestic violence occurred between her and Caldwell.

In response, DSS developed a safety plan, beginning October 22, 2018, which would leave the children in Graham's custody and prevent Caldwell from having contact with the children. DSS sought a child protective order to ensure the family cooperated with the plan. In December 2018, DSS modified the plan to allow Caldwell to have visits with the children, which were to be supervised by his mother, Mary Caldwell ("Mary").[3]

On December 20, 2018, there was another incident of domestic violence, during which Mary was injured. There was also an incident where Graham's sister, her sister's husband, and Caldwell argued and had a physical altercation. The children witnessed this incident. The

---

[1] The record in this case is sealed. To the extent that this memorandum opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case. The remainder of the record remains sealed.

[2] At trial, Kyle Marks, a sergeant with the Bedford County Sheriff's Office, testified that officers responded to calls from Graham and Caldwell's residence "at least once a month, if not multiple times a week" over a period of several years. This included calls for domestic violence, substance abuse, and custody issues.

[3] Caldwell's father, Larry Caldwell ("Larry"), was not allowed to have contact with the children because he refused to cooperate with DSS. The children were also not allowed to be present at Larry and Mary's home because DSS discovered drug paraphernalia during a home visit.

following day, December 21, 2018, a DSS social worker interviewed Graham, who was very bruised, and Graham admitted that domestic violence had occurred. The children had been with both Graham and Caldwell, without Mary's supervision, in violation of the safety plan. Consequently, DSS removed the children and placed them in foster care.

Following the removal, Graham did not pursue any of the referrals to domestic violence classes or shelters. On May 7, 2019, Graham asked the court to amend the protective order to allow her to have "peaceable contact" with Caldwell. On May 8, 2019, Caldwell "busted [Graham's] lip." On May 13, 2019, Caldwell "beat [Graham]." When Graham showed up for a visit with the children on May 15, 2019, she had extensive bruising, and she admitted to the social worker that Caldwell had hurt her. At that point, she was willing to go to a domestic violence shelter, but she was unable to go to the shelter because she tested positive for marijuana and methamphetamine.[4] Instead, she spent the night at a hotel.

The following day, Graham went to Buena Vista with her sister. Although she was in counseling prior to going to Buena Vista, she did not follow up once she moved. She did, however, regularly attend an intensive outpatient substance abuse program in Buena Vista. At some point, she completed a parenting class and a psychological assessment with a parenting component. Graham obtained her own apartment in Buena Vista.

In August 2019, Graham reconciled with Caldwell, and shortly thereafter she moved back in with him. After she returned to Caldwell, she entered an intensive outpatient substance abuse program in the area, but her attendance was sporadic and ultimately dwindled.

---

[4] The substance abuse issues leading to the removal of the children were Caldwell's. At that point, Graham had not tested positive for any prohibited substances. After the children were removed, however, Graham tested positive for methamphetamine and marijuana, and, in her testimony, she claimed that she started using drugs in 2019 after the children were removed.

On October 1, 2019, DSS filed petitions to terminate Graham's and Caldwell's parental rights to the children so they could be adopted. On November 1, 2019, the juvenile and domestic relations district court ("JDR court") conducted a hearing on the petitions. It entered an order terminating Graham's and Caldwell's parental rights pursuant to Code § 16.1-238(C)(2). Graham and Caldwell appealed to the circuit court.

As a result of the COVID-19 pandemic, there was a delay in hearing the case in the circuit court. Because of the pandemic, Graham had a virtual visit with the children. When she mentioned the children coming home, one of the children defecated in his pants. At some point, DSS discontinued Graham's visits with the children, though the record is not clear as to when.[5]

In December 2019, Graham checked herself into inpatient substance abuse treatment for five days, before leaving on her own, claiming "there was too much going on to have to worry about getting sober." In January 2020, she started her outpatient substance abuse classes again, though her attendance again dwindled. Graham and Caldwell were evicted from their home and moved in with Caldwell's parents, Larry and Mary. In February 2020, Graham indicated that she intended to check into inpatient treatment, before deciding "she could fix things on her own."

In June of 2020, Graham and Caldwell were involved in a "wreck" while they were using drugs. Stemming from that incident, Caldwell faced criminal charges and received a sentence of thirty months of incarceration. Following the incident, in July 2020, Graham returned to her intensive outpatient drug treatment classes. She tested positive for methamphetamine and marijuana in August 2020, but she has since tested negative at each subsequent test. Graham continued to live with Caldwell's parents.

---

[5] The record is not clear as to when or how often Graham visited the children. While there is no specific evidence in the record as to which visits, if any, she missed, the record does indicate that Caldwell failed to attend multiple visits.

In February 2021, Graham told the social worker that she was trying to move out of Caldwell's parents' home and find her own place. She also indicated she wanted to be able to get away from Caldwell. By April 2021, Graham told the social worker that she intended to reconcile with Caldwell and that she intended to stay at his parents' home.

The circuit court conducted a hearing on May 5, 2021. During the hearing, Graham testified that she intended to try and get back together with Caldwell, even though, as she acknowledged, it would not be best for the kids. She also acknowledged that she was unable to move from Caldwell's parents' home.

The circuit court recognized that Graham had made some progress but pointed out that she "hasn't remedied the situation yet – even now." It noted that the children should not have to wait around until the parents can do what they are supposed to do. The circuit court found that the evidence was sufficient to show by clear and convincing evidence that Graham "without good cause has been unwilling or unable within a reasonable period of time – a reasonable period of time, not to exceed twelve months, but a reasonable period of time, to remedy the circumstances that resulted in these children being removed from the care and custody of their parents." The final order terminating Graham's parental rights with respect to J.C. reflected the circuit court's oral ruling. The final order terminating Graham's parental rights with respect to L.C., however, terminated Graham's rights for failure "to maintain continuing contact with and to provide or substantially plan for the future of the child for a period of six months after the child's placement in foster care . . . ." Graham now appeals those orders to this Court.

## II. ANALYSIS

### A. *Termination of Parental Rights to the Children Under Code § 16.1-283(C)(2)*

Graham argues that the circuit court erred in terminating her parental rights to both children pursuant to Code § 16.1-282(C)(2) because DSS "filed both of the petitions for

termination of residual parental rights . . . before [Graham's] children had been in foster care for one year." She contends that the JDR court, and consequently the circuit court, did not have jurisdiction to consider the petitions because DSS filed them before the expiration of the twelve-month period.

Under Code § 16.1-283(C)(2), parental rights can be terminated if

> [t]he parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

When analyzing a statute, "we must assume that 'the legislature chose, with care, the words it used . . . and we are bound by those words as we [examine] the statute.'" *Eley v. Commonwealth*, 70 Va. App. 158, 163 (2019) (alterations in original) (quoting *Doulgerakis v. Commonwealth*, 61 Va. App. 417, 420 (2013)). "A principal rule of statutory interpretation is that courts will give statutory language its plain meaning." *Davenport v. Little-Bowser*, 269 Va. 546, 555 (2005). "[W]ords in a statute should be interpreted, if possible, to avoid rendering [other] words superfluous." *Eley*, 70 Va. App. at 164 (second alteration in original) (quoting *Cook v. Commonwealth*, 268 Va. 111, 114 (2004)).

The relevant portion of the statute allows termination "within a reasonable period of time not to exceed 12 months." Under Graham's theory, DSS must wait twelve months from the time of removal before it is permitted to file a petition for termination. This interpretation is inconsistent with the plain language of the statute. The relevant statutory period is a "reasonable period of time." The plain language of the statute indicates that the reasonable period cannot "*exceed* 12 months." (Emphasis added.) Thus, the plain language makes clear that the twelve-month period is an outer limit rather than a threshold requirement.

The interpretation of the twelve-month period as an outer limit is consistent with the purpose of the twelve-month period, which "was designed to prevent an indeterminate state of foster care 'drift' and to encourage timeliness by the courts and social services in addressing the circumstances that resulted in the foster care placement." *Thach v. Arlington Cnty. Dep't of Human Servs.*, 63 Va. App. 157, 171 (2014) (quoting *L.G. v. Amherst Cnty. Dep't of Soc. Servs.*, 41 Va. App. 51, 56 (2003)).[6] Accordingly, the twelve-month period is not a threshold requirement for DSS to file a petition to terminate. If the circumstances are such that "a reasonable period of time" has passed, DSS need not wait until the children have been in foster care for twelve months. *See Lynn v. Campbell Cnty. Dep't of Soc. Servs.*, No. 0955-19-3 (Va. Ct. App. Jan. 7, 2020) (*per curiam*) (finding that DSS did not prematurely decide to terminate parental rights prior to the expiration of the twelve-month time period).[7]

Here, the children entered foster care on December 21, 2018, and DSS filed the petitions to terminate on October 1, 2019. The circumstances here are sufficient to conclude that a "reasonable period of time" had passed. The issues leading to the children's removal had not been resolved. Prior to removal, DSS developed a safety plan to safeguard the children from witnessing domestic violence, which Graham did not comply with. Though Graham left Caldwell for a short time, she moved back in with him shortly thereafter, and she was still living

---

[6] The twelve-month time limit in the statute places limits on the amount of time permitted to remedy the conditions leading to foster care. *See L.G.*, 41 Va. App. at 57 ("The statute clearly contemplates that efforts to resolve the 'conditions' relevant to termination are constrained by time." (quoting *Lecky v. Reed*, 20 Va. App. 306, 312 (1995))). It does not, however, "temporally restrict the trial court's consideration to events that occurred between the parent and child only during that discrete twelve-month time period to the exclusion of what may have occurred before and after those dates." *Id.* This allows the trial court to consider the "*present* best interests of the child." *Thach*, 63 Va. App. at 171 (quoting *L.G.*, 41 Va. App. at 57).

[7] "Although not binding precedent, unpublished opinions can be cited and considered for their persuasive value." *Blowe v. Commonwealth*, 72 Va. App. 457, 468 n.10 (2020) (quoting *Otey v. Commonwealth*, 61 Va. App. 346, 350 n.3 (2012)).

with him when DSS petitioned for termination. Further, there is no evidence in the record that Graham had any plans to leave Caldwell. Thus, when DSS filed its petitions, Graham was no longer making attempts to remedy the conditions leading to removal. Therefore, a "reasonable period of time" had passed, and DSS was justified in filing the petitions to terminate. Accordingly, both the JDR court and the circuit court had jurisdiction to consider the petitions to terminate Graham's parental rights.

### B. Termination of Parental Rights to L.C. Under Code § 16.1-283(C)(1)

Graham argues that the circuit court erred by terminating her parental rights to L.C. under Code § 16.1-283(C)(1).[8]

Code § 16.1-283(C)(1) permits termination of parental rights where

> [t]he parent or parents have, without good cause, failed to maintain continuing contact with and to provide or substantially plan for the future of the child for a period of six months after the child's placement in foster care notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to communicate with the parent or parents and to strengthen the parent-child relationship.

Graham points out that the record contains evidence that Graham continued to visit her children after they were removed. Specifically, the record contains evidence of a May 15, 2019 visit and virtual visits after the start of the COVID-19 pandemic. Because the record contains evidence that Graham continued to visit the children, Graham argues that the circuit court erred

---

[8] In its oral ruling, the circuit court claimed it was terminating Graham's parental rights to both children because she, "without good cause has been unwilling or unable within . . . a reasonable period of time, not to exceed twelve months . . . to remedy the circumstances that resulted in these children being removed from the care and custody of their parents," which is subsection (2) of Code § 16.1-283(C). The circuit court's written order pertaining to J.C. properly reflects the oral ruling. In its written order pertaining to L.C., however, the circuit court terminated Graham's parental rights under Code § 16.1-283(C)(1). Our review of the record leads us to believe this was simply a clerical error. Nevertheless, we recognize that a trial court "speaks only through its written orders," *Jefferson v. Commonwealth*, 298 Va. 473, 477 (2021), and we must review the circuit court's written decision.

when it terminated her parental rights for "fail[ing] to maintain continuing contact with . . . the child for a period of six months after the child's placement in foster care . . . ." We agree.

The evidence in the record is insufficient to terminate Graham's parental rights to L.C. under Code § 16.1-283(C)(1). Nevertheless, we hold that the circuit court did not err in terminating Graham's parental rights because the evidence was sufficient to satisfy the requirements of Code § 16.1-283(C)(2). "In instances where a trial court's decision is correct, but its reasoning is incorrect, and the record supports the correct reason, we uphold the judgment pursuant to the right result for the wrong reason doctrine." *Haynes v. Haggerty*, 291 Va. 301, 305 (2016). *See Roane v. Halifax Cnty. Dep't of Soc. Servs.*, No. 0058-18-2 (Va. Ct. App. Dec. 4, 2018) (applying the right result, wrong reason doctrine where the evidence was insufficient to support termination under Code § 16.1-283(C)(2) but supported termination under Code § 16.1-283(C)(1)). The doctrine is applicable where the record "contains sufficient information to support the proper reason" and requires no further factual development. *Haynes*, 291 Va. at 305.

Here, the record fully supports the termination of Graham's parental rights under Code § 16.1-283(C)(2). As discussed above, clear and convincing evidence demonstrates that Graham was "unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement . . . ." Code § 16.1-283(C)(2). Not only does the record support our conclusion, but the circuit court made all the necessary factual findings in its oral ruling. Accordingly, we conclude the right result, wrong reason doctrine is applicable, and we affirm the circuit court's termination of Graham's parental rights to L.C.

*C. Best Interests of the Children*

In her final assignment of error, Graham argues that termination of her parental rights is not in the best interests of the children because she had made progress and "it was likely that each of the conditions that had caused the children to go into foster care could be remedied."

"In matters of a child's welfare, trial courts are vested with broad discretion in making the decisions necessary to guard and to foster a child's best interests." *Bristol Dep't of Soc. Servs. v. Welch*, 64 Va. App. 34, 44 (2014) (quoting *Kilby v. Culpeper Dep't of Soc. Servs.*, 55 Va. App. 106, 110 (2009)). We presume that the circuit court "thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests." *Eaton v. Washington Cnty. Dep't of Soc. Servs.*, 66 Va. App. 317, 324 (2016) (quoting *Fields v. Dinwiddie Cnty. Dep't of Soc. Servs.*, 46 Va. App. 1, 7 (2005)).

"'[T]here is no simple, mechanical, "cut and dried" way' to apply the best interests of the child standard." *Id.* at 331 (quoting *Welch*, 64 Va. App. at 48). Instead, a court must resolve the question "in light of the facts of each case." *Welch*, 64 Va. App. at 48 (quoting *Toombs v. Lynchburg Div. of Soc. Servs.*, 223 Va. 225, 230 (1982)).

> In determining what is in the best interests of the child, a court must evaluate and consider many factors, including the age and physical and mental condition of the child or children; the age and physical and mental condition of the parents; the relationship existing between each parent and each child; the needs of the child or children; the role which each parent has played, and will play in the future, in the upbringing and care of the child or children; and such other factors as are necessary in determining the best interests of the child or children.

*Id.* (quoting *Harrison v. Tazewell Cnty. Dep't of Soc. Servs.*, 42 Va. App. 149, 161 (2004)). Although Code § 16.1-283(C)(2) sets a twelve-month time limit on a parent's ability to remedy the conditions leading to foster care, "the factfinder may consider evidence before or after the

twelve-month time period in order 'to evaluate the *present* best interests of the child.'" *Thach*, 63 Va. App. at 171 (quoting *L.G.*, 41 Va. App. at 57).

Here, the primary concerns leading to the children's removal were domestic violence and substance abuse. We recognize that after multiple failed drugs tests, Graham made progress in combatting her substance abuse issues. Nevertheless, a circuit court may discount a parent's current, though delayed, progress, "if the best interests of the child would be served by termination." *Id*. (quoting *L.G.*, 41 Va. App. at 57). We conclude that the circumstances here justify termination despite Graham's progress combatting her substance abuse.

The record here demonstrates a pattern of Graham returning to her abuser. She had a history of breaking up and then getting back together with Caldwell. Graham resisted DSS efforts to get her into a domestic violence shelter. On the occasion when she did move out, she reconciled with Caldwell a short time later and moved back in with him. In fact, she was still living with him at the time of the termination hearing in the JDR court, and she continued to do so until he was incarcerated in June 2020. She told the social worker she did not intend to reconcile with him after he was released, but only months later she told the same social worker she had changed her mind and intended to get back together with him. At the circuit court hearing, she testified that she intended to try and reconcile with him when he was released—even though she acknowledged it would not be best for the children.

Furthermore, Graham still lives with Caldwell's parents—who blame Graham for the abuse she suffered at the hands of their son—and is financially unable to make other arrangements, making it very unlikely she would be able to keep Caldwell away from the children. Additionally, the original DSS safety plan prohibited the children from visiting Caldwell's parents' home because they found drug paraphernalia, and the parents did not comply with the safety plan to protect the children. Graham points to the fact that she has previously had

- 11 -

her own apartment as evidence that she will at some point be able to get her own apartment again. But she was not able to remedy her living situation in the nearly two-and-a-half years since the time of the children's removal, and she provided no timeline within which she expected to have it remedied.

Graham suggests that the circuit court could have put restrictions in place that would prevent Caldwell from having access to the children. Graham's argument, however, neglects the fact that DSS attempted to do exactly that prior to removing the children, and Graham did not comply with the plan. "As many courts have observed, one permissible measure of a parent's future potential is undoubtedly revealed in the parent's past behavior with the child." *Eaton*, 66 Va. App. at 332 (quoting *Toms v. Hanover Dep't of Soc. Servs.*, 46 Va. App. 257, 268 (2005)).

Given Graham's history of returning to her abuser, her testimony that she intends to reconcile with Caldwell—knowing it was not good for her children—and her inability to move out of Caldwell's parents' home, we find it is in the best interest of the children to terminate Graham's parental rights. It is "not in a child's best interest to 'wait a significant period of time to "find out when, or even if, a parent will be capable of resuming [her] responsibilities."'" *Id.* (quoting *Farrell v. Warren Cnty. Dep't of Soc. Servs.*, 59 Va. App. 375, 411-12 (2012)). Accordingly, the circuit court did not err in finding that termination was in the best interests of the children.

### III. CONCLUSION

For the foregoing reasons, we affirm the decision of the circuit court.

*Affirmed.*